UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MARK A. BROWN | ) | CASE NO: 4:04CV1727 |
| | ) | |
| Petitioner | ) | |
| | ) | JUDGE JOHN R. ADAMS |
| -vs- | ) | |
| | ) | <u>MEMORANDUM OF OPINION</u> |
| MARGARET BRADSHAW, WARDEN | ) | <u>AND ORDER</u> |
| | ) | |
| | ) | |
| Respondent | ) | |

Petitioner, Mark A. Brown ("Brown" or "Petitioner"), has filed a Petition for Writ of

Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254. (ECF 21).  He challenges his

convictions and sentence for the aggravated murders of Isam Salman and Hayder Al-Turk that

were imposed by the Mahoning County, Ohio Court of Common Pleas Court.  Brown also

asserts that the Ohio death penalty statutes, R.C. §§ 2903.01 through 2929.05, are

unconstitutional.  Along with the Petition, the Court has reviewed the Respondent, Margaret

Bradshaw's ("Respondent"), Return of Writ (ECF 39) and the Petitioner's Traverse. (ECF 65).

For the following reasons, Brown's Petition for Writ of Habeas Corpus is denied.

Factual Background

On March 4, 1994, Brown was indicted by the Mahoning County Grand Jury charged

with four counts of aggravated murder.  Counts One and Two alleged that Brown did purposely

and with prior calculation and design cause the deaths of Isam Salman and Hayder Al-Turk, in

violation of R.C. § 2903.01(A).  Each count included death penalty specifications alleging that

the murders were committed as a course of conduct involving the purposeful killing or attempt to

kill two or more people, that the offense was committed while committing, attempting to commit

or fleeing immediately after committing or attempting to commit aggravated robbery and that he

was a principal offender and had a firearm under his control.  Counts Three and Four alleged that

Brown committed aggravated murder while committing aggravated robbery and included the

same death penalty and firearm specifications.  Count Five alleged aggravated robbery in

violation of R.C. § 2911.01(A)(1)(B) and Count Six charged Brown with having a weapon under

a disability in violation of R.C. § 2923.13(A)(3)(B).  Apx. Vol. 1, pg. 41. On March 11, 1994,

Brown filed a Waiver of Arraignment and entered a plea of not guilty. Apx. Vol. 1, pg. 51.

Trial commenced on January 4, 1996 with the selection of jurors. The presentation of

evidence began on January 30, 1996.

The facts as stated by the Ohio Supreme Court are as follows:

On the evening of January 28, 1994, appellant went with his friend, Allen
Thomas, a.k.a. "Boonie," a juvenile, and Boonie's uncle, Gary Thomas, to a store
to purchase beer and wine. Thomas then drove them to the home of Boonie's
cousin, Kenny Dotson, to play cards. A group of juveniles was also at the house
that evening. Appellant and Boonie drank wine mixed with a number of Valiums,
and smoked marijuana in "blunts," which are cigars that have been cut open,
emptied of tobacco, and filled with marijuana. Thomas stated that while playing
cards, appellant pulled out a gun and put it back in his pants or coat pocket.
Thomas further stated that appellant talked about the movie "Menace II Society"
and said that he wanted to copy the scene in the movie where assailants robbed
and killed two Oriental store clerks.
Later that night, Thomas drove appellant and Boonie to the Midway
Market in Youngstown to buy more drinks. Thomas parked the car while
appellant and Boonie entered the store together. A group of minors who had been
at Dotson's house earlier were standing just outside the store. Two of the minors,
Marcus Clark and Myzelle Arrington, saw appellant and Boonie leave the store.
They then saw appellant reenter the store alone, wearing a mask or bandanna
around his neck. They said that Boonie and Thomas were in the car. They then
heard gunshots and ran back to the Dotson home.
Thomas verified the boys' account of what occurred, and added that before

2

reentering the store, appellant said, "I forgot to do something." While appellant was in the store, Thomas heard gunshots. Thomas saw appellant casually walk away from the store and get back into his car. When Thomas asked appellant what went on in the store, appellant replied, "Oh, that wasn't nothing but some firecrackers." Thomas drove appellant and Boonie back to the Dotson home, where he observed appellant "messing with the gun." Thomas also noticed that there was blood on appellant's hand and clothing. Both Clark and Arrington saw appellant either wiping off or loading a 9-mm black gun. Arrington saw him counting money.

At approximately 9:55 that evening, Officer Timothy Morgan Jr. of the Youngstown Police Department received a call that a robbery was in progress at the Midway Market. He and his partner arrived on the scene and found two Arab males who had been shot and were apparently dead. One victim was found lying on the floor face up and the other was kneeling behind the register counter. A "blunt" and a packet of marijuana were on the floor nearby. The victims were later identified as storeowner Isam Salman and employee Hayder Al Turk. Dr. Anil Nalluri, Chief Deputy Coroner of Mahoning County, performed autopsies and determined that the victims died of hemorrhage and shock as a result of gunshot wounds to the head.

Lieutenant David McKnight interviewed several witnesses and, on January 31, 1994, secured a warrant for appellant's arrest. On February 3, 1994, appellant was arrested in Warren and transported back to Youngstown. After advising him of his *Miranda* rights, which he waived in writing, police began questioning him. During the questioning, appellant admitted being at the Midway Market but claimed that Boonie was the shooter. Although police knew that video cameras in the store were not operating during the murders, the lieutenant asked appellant whether he knew that there were video cameras in the store. Appellant said that he had not noticed. Police told him that there were two video cameras in the store. Appellant replied, "Well, I guess you know what happened there then." When the police answered, "yes," appellant stated, "Well, you've got me." He also said, "Then you know I did it." Appellant then admitted to shooting one of the victims, but stated that he did not recall shooting the second victim. Appellant claimed that he got the gun from Steven Dotson and had "just flipped out." Appellant expressed regret over what happened and explained, "It's the Valliums [sic]. They make you go off."

When appellant was apprehended, police retrieved a 9-mm Glock semiautomatic firearm under the couch cushion in the front room. The firearm was later identified by Steve Jones, who said that Brown had robbed him of his car at gunpoint on December 15, 1993; Jones's Glock was in the car's trunk at the time. Michael Roberts, a forensic scientist in the BCI firearms department, examined the Glock firearm, nine cartridge casings recovered from the crime scene, and four bullets retrieved from the victims. He concluded that all nine cartridges were fired from the Glock firearm. He further concluded that the bullets recovered from the victims indicated that they were fired from a Glock weapon;

however, he could not confirm or eliminate the Glock retrieved from appellant as the weapon from which they were fired.

At trial, appellant took the stand in his own defense. Appellant admitted shooting one of the victims but not the other. He testified that Boonie was with him at the time of the shooting, and that Boonie took the gun from him after the first victim was shot. He stated that he did not steal any money from the store. Although he told police that he got the gun from Steven Dotson, he testified that he actually got it from a different friend, Mike Austin. Appellant further testified that he was "messed up" when police interviewed him, and that he requested an attorney two or three times, but that this request was denied.

On February 8, 1996, the jury returned a verdict of guilty on both counts of aggravated murder by prior calculation and design along with two out of the three specifications, i.e., conduct involving the purposeful killing of or attempt to kill two or more persons and having a firearm on or about his person or under his control during the commission of the offense.

The sentencing phase of the trial began on February 20, 1996.  The jury, finding that the aggravated circumstances outweighed the mitigating factors, returned a sentencing verdict of death for the murder of Isam Salman, Apx. Vol. 2, pg. 362, and life imprisonment for the murder of Hayder Al-Turk, on February 24, 1996. Apx. Vol. 2, pg. 363.

On February 28, 1996, the trial court accepted the recommendation of the jury and sentenced Brown to death. The sentences on Counts One and Two were imposed consecutively. Further, the court found that the firearm specifications in Counts One and Two do not merge and that there were separate acts involved in the aggravated murders as to each victim so Brown was sentenced to three years to be served consecutively to the sentence imposed on Count One and the same as to Count Two, the firearm specifications to be served consecutively to the sentence imposed in Count Two. Apx. Vol. 2, pg. 364.

Procedural History

Direct Appeal

Brown filed a timely Notice of Appeal in the Ohio Court of Appeals, Seventh Appellate

District, on March 15, 1996, alleging the following fifteen assignments of Error:

**Assignment of Error No. 1:**
The Trial Court Erred in Overruling Appellant's Motion to Suppress His
Confession, in Violation of Appellant's Privilege Against Self-Incrimination, and
Appellant's Right to Counsel, U.S. Const. Amend. V, VI and XIV, and Ohio
Const. Art. I, §§ 1, 2, 10, and 16.
**Assignment of Error No. 2:**
The Trial Court Erred in Permitting "Other Acts" Evidence to Be Placed Before
the
Jury, Thereby Depriving Appellant a Fair Trial in Violation of U. S. Const.
Amend. VI, VIII, and XIV; and OHIO Const. Art. I §§ 1, 2, 9, 10, and 16, and
Ohio Rev.
Code Ann. § 2945.59 and Ohio Evid. R. 404(B).
**Assignment of Error No. 3:**
TheTtrial Court Erred and Denied Appellant a Fair Trial by Allowing Appellant
to
Be Impeached with Both Prior Convictions and "Other Acts." Ohio Const. Art. I,
§§ 1, 2, 10, and 16; U.S. Const. Amend. VI and XIV.
**Assignment of Error No. 4:**
The Trial Court Erred in Overruling Appellant's Motion to Require the Jury to
Articulate its Methods and Reasoning for Determining that the Aggravating
Circumstances Outweigh the Mitigating Factors, and in Overruling Appellant's
Constitutional Motion to Dismiss, Thereby Depriving Appellant of the Ability to
Defend Life, Equal Protection and Benefit of the Laws, the Ability to Remain
Free
From Cruel and Unusual Punishment, the Administration of Justice Without
Denial, a Remedy By Due Course of Law, and Due Process of Law, Ohio Const.
Art. I §§ 1, 2, 9, and 16 and U.S. Const. Amend. VIII and XIV.
**Assignment of Error No. 5:**
The Trial Court Erred in Admitting Certain Exhibits in the Penalty Phase,
Thereby
Inviting the Jury to Consider Non-statutory Aggravating Circumstances.
Appellant's Death Sentence Therefore Was Not Reliably Determined, U.S. Const.
Amend. VIII and XIV, Ohio Const. Art. I, §§ 1, 2, 9, and 16.
**Assignment of Error No. 6:**
The Trial Court Erred in Failing to Give a Supplemental Charge to the Coercive
*Howard* Charge, Thus, Depriving Defendant of a Fair Trial, U.S. Const. Amend.

5

VI and XIV, Ohio Const. Art. I, §§ 1, 2, 10, and 16.

**Assignment of Error No. 7:**

The Court Erred in Failing to Declare a Mistrial Thus Depriving Defendant of Due Process and His Right to a Fair Trial, U.S. Const. Amend. VI and XIV, and Ohio Const. Art. I, §§ 1, 2, 10, and 16.

**Assignment of Error No. 8:**

The Cumulative Effect of Errors Denied Appellant a Fair Trial and Due Process; Accordingly, Neither His Convictions Nor Death Sentence May Stand Under U.S. Const. Amend. XIV and Ohio Const. Art. I, §§ 1, 2, 9, 10, and 16.

**Assignment of Error No. 9:**

The Trial Court Erred in Failing to Dismiss the Death Specifications, and in Imposing the Death Sentence for the Death of Isam Salman. A Reviewing Court May Not Compare Death Sentences Only With Other Death Sentences and Still Follow the Constitutional Demands for a Proportionality Review, Nor May a Reviewing Court Conduct a Meaningful Proportionality Review Without Sufficient Data on Jurors' Rationale for Choosing a Life Sentence Over the Death Penalty, for to Do So Violates the Guarantees of U.S. CONST. Amend. VIII and XIV; Ohio Const. Art. I, §§ 1 and 9.

**Assignment of Error No. 10:**

The Trial Court Erred in Overruling Appellant's Motion to Dismiss, Because the Ohio Capital Laws, Both as Enacted and as Interpreted, Deny a Capital Defendant Meaningful Appellate Review, an Indispensable Ingredient in Imposing a Death Sentence Consistent with U.S. Const. Amend. VIII and XIV and Ohio Const. Art. I, §§ 1, 2, 9, and 16.

**Assignment of Error No. 11:**

The Trial Court Erred in Refusing a Mercy Instruction. The Preclusion of a Mercy Instruction Prohibits Trial Juries from Recommending Life Sentences Where the Aggravating Circumstances Outweigh the Mitigating Factors, but the Jurors Nonetheless Conclude That the Death Sentence Is Not Appropriate; Therefore, Ohio's Death Penalty, with its Mandatory Death Sentences under Certain Circumstances Violate the State and Federal Constitutions. Ohio Const. Art. I, §§ 1, 2, 9, 16; U.S. Const. Amend. VIII and XIV.

**Assignment of Error No. 12:**

The Trial Court Erred in Failing to Dismiss the Death Specifications Because the Ohio Death Penalty Law Involves an Excessive and Imprecise Use of Government Power So as to Encroach Upon the "Inalienable" Liberties Specified in the Ohio Constitution; Ohio Const. Art. I, §§ 1, 2, 9, 10, 16, and 20.

**Assignment of Error No. 13:**

The Trial Court Erred in Failing to Dismiss the Death Specifications. Ohio's Death Penalty Law, Ohio Rev. Code Ann. §§2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04, and 2929.05, Violates U.S. Const. Amend. V, VI, VIII, and XIV and the Immunities Specified in Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, and 16.

**Assignment of Error No. 14:**

The Trial Court Erred in Failing to Dismiss the Death Specifications, Because the Death Penalty Violates U.S. Const. Amend. VIII and XIV and Ohio Const. Art. I, §§ 1, 2, 9 and 16 Since the Methods of Execution Violate Evolving Standards of Human Decency, an Integral Part of Due Process.

**Assignment of Error No. 15:**
The Trial Court Erred in Failing to Dismiss the Death Specifications. The Death Penalty Violates the United States and Ohio Constitutions Because the Irrevocable Nature of the Penalty Makes it Impossible to Cure Errors, Including Actual Innocence.

Apx. Vol. 3, pg. 96. The State filed its merit brief on June 30, 1999. Apx. Vol. 3, pg. 361.

The Seventh District Court of Appeals affirmed Browns convictions and sentence on January 30,

2001.  Apx. Vol. 3, pg. 437.

On March 13, 2001, Brown filed a Notice of Appeal to the Supreme Court of Ohio. Apx.

Vol. 4, pg. 3. On June 4, 2001, Brown filed a merit brief in which he asserted the following

fifteen  propositions of law:

**Proposition of Law No. 1:**
Failure to Give a Proper Supplemental Instruction to a Capital Jury Which Has Notified the Court That Penalty Phase Deliberations Have Reached an Impasse Denies Due Process of Law and a Fair Trial, U.S. Const. Amend. VI and XIV, Ohio Const. Art. I, §§ 1, 2, 10, and 16.

**Proposition of Law No. 2:**
A Trial Court Must Declare a Mistrial to Protect an Accused's Right to Due Process and a Fair Trial When the Validity of a Verdict is Doubtful. U.S. Const. Amend. VI and XIV, and Ohio Const. Art. I, §§ 1, 2, 10, and 16.

**Proposition of Law No. 3:**
The Use of Prejudicial and Tenuously Connected Evidence under the Guise of "Other Acts" Deprives a Criminal Defendant a Fair Trial in Violation of the U.S. Const. Amend. VI, VIII, and XIV; and Ohio Const. Art. I, §§ 2, 29, 10, and 16, and Ohio Rev. Code Ann. §2945.59.

**Proposition of Law No. 4:**
Impeachment with Both Prior Convictions and "Other Acts" Denies Due Process of Law, a Fair Trial, and the Ability to Effectively Defend Liberty and Have Justice Administered Without Denial. Ohio Const. Art. I, §§ 1, 2, 10, and 16; U.S. Const. Amend. VI and XIV.

**Proposition of Law No. 5:**
Intoxication Precludes a Voluntary Confession and Likewise Precludes The Ability to Knowingly, Voluntarily and Intelligently Waive the Known Privilege

7

Against Self-Incrimination, and the Right to Counsel. U.S. Const. Amend. V, VI, and XIV, and Ohio Const. Art. I, §§ 1, 2, 10, and 16.

**Proposition of Law No. 6:**

The U.S. Const. Amend. VIII and XIV, Ohio Const. Art. I, §§ 1, 2, 9, and 16 Require That Any Sentence of Death Be Reliably Determined. When a Court Permits Admission of Irrelevant But Repetitive and Inflammatory Exhibits at the Penalty Phase, the Reliability of the Death Sentence Must Be Questioned.

**Proposition of Law No. 7:**

An Individual on Trial in a Capital Case Is Entitled to Have His Conviction and Sentence Subjected to Strict Scrutiny for Cumulative Errors, for the Cumulative Effect of Errors Denies a Fair Trial. U.S. Const. Amend. XIV; Ohio Const. Art. I, §§ 1, 2, 10, and 16.

**Proposition of Law No. 8:**

The Ability to Defend Life, Equal Protection and Benefit of the Laws, the Ability to

Remain Free From Cruel and Unusual Punishment, the Administration of Justice Without Denial, a Remedy by Due Course of Law, and Due Process of Law, Ohio Const. Art. I, §§ 1, 2, 9, and 16 and U.S. Const. Amend. VIII and XIV, Are All Denied When a Capital Jury Is Not Required to Articulate Its Methods and Reasoning for Determining that the Aggravating Circumstances Outweigh the Mitigating Factors.

**Proposition of Law No. 9:**

A Reviewing Court May Not Compare Death Sentences Only with Other Death Sentences and Still Follow the Constitutional Demands for a Proportionality Review, Nor May a Reviewing Court Conduct a Meaningful Proportionality Review Without Sufficient Data on Jurors' Rationale for Choosing a Life Sentence over the Death Penalty, for to Do So Violates the Guarantees of U.S. Const. Amend. VIII and XIV; Ohio Const. Art. I, §§ 1 and 9.

**Proposition of Law No. 10:**

Ohio Capital Laws, Both as Enacted and as Interpreted, Deny a Capital Defendant Meaningful Appellate Review, an Indispensable Ingredient in Imposing a Death Sentence Consistent with U.S. Const. Amend. VIII and XIV and Ohio Const. Art. I, §§ 1, 2, 9, and 16.

**Proposition of Law No. 11:**

Precluding a Mercy Instruction Violates Ohio Rev. Code Ann. § 2929.04(B), Ohio Const. Art. I, §§ 1, 2, 9, 16; U.S. Const. Amend. VIII and XIV.

**Proposition of Law No. 12:**

Ohio's Death Penalty Law Involves an Excessive and Imprecise Use of Government Power that Encroaches Upon the "Inalienable" Liberties Specified in the Ohio Constitution; Ohio Const. Art. I, §§ 1, 2, 9, 10, 16, and 20.

**Proposition of Law No. 13:**

Ohio's Death Penalty Law, Ohio Rev. Code Ann. §§ 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04, and 2929.05, Violates U.S. Const. Amend.V, VI, VIII and XIV and the Immunities Specified in Ohio Const.

Art. I, §§ 1, 2, 5, 9, 10, and 16.
**Proposition of Law No. 14:**
The Ohio Death Penalty Violates U.S. Const. Amend. VIII and XIV and Ohio
Const. Art. I, §§ 1, 2, 9 and 16 Since the Methods of Execution Violate Evolving
Standards of Human Decency, an Integral Part of Due Process.
**Proposition of Law No. 15:**
The Death Penalty Violates the United States and Ohio Constitutions Because the
Irrevocable Nature of the Penalty Makes it Impossible to Cure Errors, Including
Actual Innocence.

Apx. Vol. 4, pg. 17. On June 26, 2001, the State filed its merit brief. Apx. Vol. 4, pg.

444.

On October 8, 2003, the Supreme Court of Ohio affirmed the judgment of the trial court,

and upheld Brown's convictions and sentence. Apx. Vol. 4, pg. 518. Brown filed a Petition

for Writ of Certiorari in the United States Supreme Court on January 5, 2004 under case number

03-8255. Apx. Vol. 4, pg. 541. The United State Supreme Court denied the petition on March 1,

2004. Apx. Vol. 4, pg. 542. Brown filed a second Petition for Writ of Certiorari on April 29,

2004. Apx. Vol. 4, pg. 543. The second petition was denied on June 21, 2004. Apx. Vol. 4,

pg. 552.

Post-conviction Proceedings

On April 13, 1998 Brown  filed a Motion for Post-conviction Relief with the trial court

under R.C. § 2953.21 raising the following two grounds for relief.

**First Ground For Relief:** Petitioner's Sixth Amendment Right to a Fair and
Impartial Jury Was Violated by the Trial Court's Coercing the Jury to Reach a
Verdict
**Second Ground For Relief:** Trial Counsel Provided Ineffective Assistance of
Counsel and Prejudiced the Defense by Obtaining a Discoverable Statement from
Petitioner's Mother Containing Damaging Information

Apx. Vol. 5, pg. 37.

On June 28, 1999, the State moved for summary judgment on Brown's petition. Apx.

9

Vol. 5, pg. 108. On August 24, 1999, Brown filed a Memorandum in Opposition to the State's

Motion for Summary Judgment. Apx. Vol. 5, pg. 120. On September 12, 2001, the trial court

granted the State's Motion for Summary Judgment and denied Brown's Petition for Post-

conviction Relief. Apx. Vol. 5, pg. 199.

On December 13, 2001, Brown filed a timely Notice of Appeal from the trial court's

decision to the Seventh District Court of Appeals. Apx. Vol. 6, pg. 6. On May 24, 2002, Brown

filed a merit brief in support of the appeal, setting forth the following two assignments of error:

> **Assignment of Error No. I**
> The trial court's dismissal of Appellant's post-conviction proceeding must be
> reversed and Appellant's case remanded to the trial court with instructions that
> qualified counsel be appointed and that Appellant be granted sufficient time and
> resources to file a properly supported post-conviction petition in order to preserve
> Appellant's due process rights under the Fourteenth Amendment to the United
> States [Constitution.] The Ohio Legislature has acted to ensure that death
> sentenced post-conviction petitioners are represented by competent counsel.
>
> **Assignment of Error No. II**
> The trial court erred in granting summary judgment against Appellant Brown and
> dismissing his post-conviction action in violation of Appellant's rights under
> Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States
> Constitution.

Apx. Vol. 6, pg. 56.

On August 9, 2002, the State filed its brief in opposition to the appeal. Apx. Vol. 6,

pg. 185. Then, on June 30, 2003, the court of appeals affirmed the judgment of the trial court.

Apx. Vol. 6, pg. 223.

Brown filed a Notice of Appeal in the Supreme Court of Ohio on Ohio on August 5, 2003

along with his Memorandum in Support of Jurisdiction alleging the following two propositions

of law:

10

**Proposition of Law No. I**
The trial court's dismissal of appellant's post-conviction proceeding must be reversed and appellant's case remanded to the trial court with instructions that qualified counsel be appointed and that appellant be granted sufficient time and resources to file a properly supported post-conviction petition in order to preserve appellant's due process rights under the Fourteenth Amendment to the United States [sic] the Ohio Legislature has acted to ensure that death sentenced post-conviction petitioners are represented by competent counsel.

**Proposition of Law No. II**
The trial court erred in granting summary judgment against appellant Brown and dismissing his post-conviction action in violation of appellant's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Apx. Vol. 7, pg. 5.

On January 21, 2004, the Ohio Supreme Court declined jurisdiction to hear the case and dismissed the appeal as not involving any substantial constitutional question. Apx. Vol. 7, pg. 55.

Murnahan Appeal

On April 30, 2001, Brown  filed an Application for Reopening Pursuant to Ohio App. R. 26(B) and *State v. Murnahan*, 63 Ohio St.3d 60 (1992), in the Seventh District Court of Appeals. Apx. Vol. 8, pg. 14.  He alleged the following assignment of error:

The trial court erred and denied Appellant a fair trial by allowing Appellant to be impeached with both prior convictions and "other acts."  Ohio Const. Art. I §§ 1,2,10, and 16; U.S. Const. Amend. VI and XIV.

Apx. Vol. 8, pg. 14.

The State filed its Memorandum in Opposition to Reopening on May 10, 2001. Apx. Vol. 8, pg. 29.  On August 15, 2001, the appellate court denied the Application to Reopen. Apx. Vol. 8, pg. 37. Brown did not appeal the denial to the Supreme Court of Ohio.

Federal Habeas Corpus

On  August 26, 2004, Brown filed a Notice of Intent to File a Petition for Writ of Habeas

Corpus.  His Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 was filed on June

3, 2005 raising the following eleven grounds for relief.

First Ground for Relief

Petitioner Brown was denied the effective assistance of counsel in his capital trial
as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the
United States Constitution.

Second Ground for Relief

Mr. Browns convictions are void or voidable because he did not receive the
effective assistance of counsel during the trial and penalty phases of his trial.

Third Ground for Relief

Petitioner Brown's conviction and/or sentence is void or voidable because his
trial attorneys failed to properly investigate and present mitigating evidence
which was available at the time of Petitioner's trial.

Fourth Ground for Relief

At Petitioner's trial the court admitted testimony evidence which denied Mr.
Brown of his due process, equal protection and impartial jury rights under the
Fifth, Sixth, Eighth and Fourteenth Amendments to the United States
Constitution.

Fifth Ground Relief

Mr. Brown's conviction and sentence are void or voidable because the sentence
of death is *per se* excessive and disproportionate to the penalty imposed in the
Petitioner's separate trial for aggravated murder pertaining to Count II of the
indictment.  The facts and evidence presented with regard to Count II were
virtually identical to the facts and evidence of Count I, for which Mr. Brown
received a sentence of death.

Sixth Ground for Relief

The Ohio death penalty scheme is unconstitutional on its face in violation of the
United States Constitution and Ohio Constitution.

Seventh Ground for Relief

The State failed to prove and the jury failed to find Petitioner Brown had specific
intent to kill Isam Salman.  The conviction and death sentence violated the Fifth,
Sixth, Eighth and Fourteenth Amendments.

Eighth Ground for Relief

Mr. Brown's conviction and sentence are void or voidable because of the trial
court failing to give a proper instruction to the jury at the penalty phase by
coercing the jury to reach a verdict, in violation of the Fifth, Sixth, Eighth, Ninth
and Fourteenth Amendments to the United States Constitution.

Ninth Ground for Relief

12

Mr. Brown's conviction and sentence are void or voidable because the trial court
erred in admitting gruesome, repetitive and cumulative photographs during the
penalty phase denying his right to a fair trial in violation of the Fifth, Sixth,
Eighth, and Fourteenth Amendments to the United States Constitution.

Tenth Ground for Relief

Petitioner Brown was deprived of having a full and fair evidentiary hearing in
state post-conviction proceedings as guaranteed by the Fifth, Eighth and
Fourteenth Amendments to the United States Constitution.

Eleventh Ground for Relief[1]

The trial court erred in refusing a mercy instruction in violation of Amendments
Fifth, Eighth and Fourteenth of the United States Constitution.

Standard of review.

The Anti Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") amending 28

U.S.C. § 2254, became effective on April 24, 1996.  The AEDPA changed the standard of review

to be applied by the federal court to Petitions for Writ of Habeas Corpus.  Brown filed his

Petition on June 3, 2005, after the AEDPA became effective, so the Court will utilize the

amended standard which gives deference to the state court's decision.  The AEDPA provides in

pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant
> to the judgment of a State court shall not be granted with respect to any claim that was
> adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>   (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or
>   (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1)-(2).

The United States Supreme Court explained the applicable AEDPA provision in *Williams*

*v. Taylor*, 529 U.S. 362 (2000).  First, the Court determined that the words "contrary to" and

---

[1]   Petitioner mistakenly submitted two Tenth Grounds for Relief.

13

"unreasonable" have independent meanings. *Id.* 529 U.S. at 404.  Every clause and every word of a statute must be given effect.  *Id.* (citing, *United States v. Manasche,* 348 U.S. 528, 538-39 (1955)).  A state court decision is "contrary to" Supreme Court precedent if (1) "the state court arrives at a conclusion opposite to that reached by this Court in a question of law" or (2) "if the state court confronts facts that are materially undistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" to it.  *Id.* 529 U.S. at 405.  Since the word "contrary" means "diametrically different," "opposite in character or nature," or "mutually opposed," as defined in Websters Third New International Dictionary 495 (1976), the state court's decision must be substantially different from the Supreme Court precedent. *Id.*  Further, a state court decision would be contrary to clearly established Supreme Court law if (1) the state court applies a rule that contradicts the governing law set forth in Supreme Court cases or if (2) the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and still arrives at a result different from the Court's precedent.  *Id*. 529 U.S. at 405-06.

A state court decision can be considered an "unreasonable application" of clearly established precedent if "the state court identifies the correct governing legal rule from the Supreme Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* 529 U.S. at 407.  An unreasonable application is distinguishable from an incorrect application of federal law.  A writ of habeas corpus may not be issued just because the court concludes that a state court decision applied clearly established law erroneously or incorrectly. The application must be unreasonable.  *Id.* 529 U.S. at 411.  See *Bell v. Cone*, 535 U.S. 685, 698-99 (2002)(petitioner must show that he would have satisfied applicable Supreme Court precedent if his claim was analyzed in the first instance because petitioner must show more than that the

14

state-court decision applied Supreme Court precedent incorrectly, but must show that the court applied precedent in an objectively unreasonable manner).

The *Williams* Court referred to *Teague v. Lane*, 489 U.S. 288, 301 (1989), for aid in interpreting the "clearly established law" requirement. The *Teague* case involved a determination of whether a new rule of law was retroactive. The Court did not attempt to define what may or may not constitute a new rule for retroactivity purposes. It stated that in general, a case announces a new rule when it breaks new ground or imposes a new obligation on the states or federal government. A case sets forth a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final. *Williams* considered the *Teague* case the equivalent of a statutory provision requiring exclusive reliance on "clearly established law." *Id.* 529 U.S. at 379. What would qualify as an old rule under *Teague* constitutes "clearly established law." *Id.* 529 U.S. at 412; *Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000)(district court cannot look to lower federal court decisions in determining whether the state court decision is contrary to, or an unreasonable application of, clearly established federal law).

Exhaustion and Procedural Default

A. Exhaustion

A state prisoner must exhaust his state remedies before bringing a claim in a federal court for habeas corpus relief. *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999); *Rose v. Lundy,* 455 U.S. 509 (1982). Exhaustion is satisfied when the highest court in the state in which the prisoner has been convicted has had a full and fair opportunity to rule on the claims. *O'Sullivan,* 526 U.S. at 842. If the petitioner has the right under state law to raise a claim under any available procedure, he has not exhausted his state remedies. 28 U.S.C. § 2254(b), (c); *Rust v. Zent,* 17 F.3d 155, 160

15

(6th Cir. 1994).   The petitioner has the burden of demonstrating that he has exhausted all his available remedies.   *Prather v. Rees*, 822 F.2d 1418, 1420 n. 3 (6th Cir. 1987).   The Respondent agrees that Brown has exhausted all of his claims.

B. Procedural Default.

A federal court cannot consider any claim raised in a Petition for Writ of Habeas Corpus that has not been resolved on the merits in state court.  *Wainright v. Sykes*, 433 U.S. 72, 87 (1977).  "In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas corpus review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law; or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  *Coleman v. Thompson*, 501 U.S. 722, 749 (1991). *See Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).

In *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986), the Sixth Circuit set forth a four part test to determine if a claim is procedurally defaulted: "(1) the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule; (2) the court must determine whether the state courts actually enforced the state procedural sanction; (3) it must be decided whether the state procedural forfeiture is an adequate and independent state ground upon which the state can rely to foreclose review of a federal constitutional claim; and (4) if the court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner is required to demonstrate that there was cause for him not to follow

16

the procedural rule and that he was actually prejudiced by the alleged constitutional error." In order to show cause, the petitioner must demonstrate that an objective factor external to the defense impeded counsel's efforts to comply with the state procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Prejudice is proven by showing a disadvantage infecting the trial with constitutional error. *United States v. Frady*, 456 U.S. 152, 168 (1982). The claim must be presented to the state courts under the same theory in which it is later presented in federal court. *Lott v. Coyle*, 261 F.3d 594, 607, 611, 617, 619 (6th Cir. 2001).

Issues that could be raised on direct appeal are barred by the doctrine of *res judicata*. In *State v. Perry*, 10 Ohio St.2d 175 (1967), the Ohio Supreme Court ruled that "[U]nder the doctrine of *res judicata*, a final judgment of conviction bars a convicted defendant who was represented by counsel from raising and litigating in any proceeding except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial, which resulted in that judgment of conviction, or on appeal from that judgment." *Id.* at 180. *See State v. Roberts*, 1 Ohio St.3d 36, 39 (1982). The Sixth Circuit has held that the "Perry" rule is regularly and consistently applied by Ohio courts and is an adequate and independent state ground upon which to procedurally bar consideration of habeas claims. *Buell*, 274 F.3d at 349; *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001).[2]

---

[2]   The Supreme Court of Ohio recognized an exception to the *Perry* rule in *State v. Hester*, 45 Ohio St. 2d 71 (1976). *Hester* concluded that, where the record does not disclose that the issue of competent trial counsel has been adjudicated, *res judicata* is an improper basis upon which to dismiss an Ohio post-conviction petition. *Id.* at syllabus para. 2. The Ohio Supreme Court subsequently modified the *Hester* exception to the *Perry* rule in *State v. Cole*, 2 Ohio St.3d 112. 114 (1982), finding that:

> Where the defendant, represented by new counsel upon direct appeal fails to raise therein the issue of competent trial counsel, and said issue could fairly have been determined without resort to evidence outside the record, res judicata is a proper basis for dismissing defendant's petition for post-conviction relief.

Post-conviction issues supported by evidence *de hors* the record as well as evidence appearing on the record are not subject to *res judicata*. *State v. Smith*, 17 Ohio St.3d 98 (1985). Evidence outside the record will permit issues to be litigated that were not raised or could have been raised on appeal.  *Res judicata* will not apply if the evidence outside the record shows that the petitioner could not have appealed the constitutional claim based upon information in the original trial record. *State v. Combs*, 100 Ohio App.3d 90, 97 (Ohio App. 1st Dist. 1994).

Any evidence presented outside the record must satisfy the same restricted standard of validity, otherwise it would be too easy to defeat the doctrine of *res judicata* as set forth in *Perry*. *State v. Lawson,* 103 Ohio App.3d 307, 315 (Ohio App. 12th Dist. 1995).  The evidence that was available to the petitioner at the time of the direct appeal is not *de hors* the record simply because it was not raised at that time.  *State v. Blackmon,* 1997 WL 423047 at *1 (Ohio App. 9th Dist. Jul. 16, 1997).  Nor could the evidence be in existence and available for use at time of trial.  *State v. Smith,* 1994 WL 273267 * 5 (Ohio App. 1st Dist. Jun. 24, 1994). *See State v. Williams*, 149 Ohio App.3d 434, 442-43 (Ohio App. 6th Dist. 2002), *cert. denied*, 541 U.S. 963 (2004)(evidence *de hors* the record must demonstrate that the petitioner could not have appealed the claim based on information in the trial record).   The evidence *de hors* the record presented during post-conviction proceedings cannot be excessive or cumulative to the evidence on record.  It must support the claim in a manner that the record lacked.  *Cowen v. Bagley,* 236 F. Supp.2d 841, 862 (S.D. Ohio 2002) (citing, *State v. Powell*, 90 Ohio App.3d 260, 268 (Ohio

---

*Id.* at syllabus. These modifications to the *Perry* rule have led federal habeas courts to conclude that Ohio's post-conviction statute, upon which *Perry* rests, satisfies due process. *Morales v. Coyle*, 98 F. Supp. 2d 849, 861. (N.D. Ohio 2000).

18

App. 1st Dist. 1993)).

Under Ohio law, errors which are not preserved by objection at the trial are considered waived and may not be raised upon appeal. *Stores Realty Co. v. Cleveland Bd. of Bldg. Standards and Bldg. Appeals*, 41 Ohio St.2d 41, 43, (1975). The objection must be made contemporaneous to the challenged testimony. *See Engle v. Isaac*, 456 U.S. 107, 124 (1982) (violation of Ohio's contemporaneous objection rule barred appellate review).  The Sixth Circuit has held that Ohio's contemporaneous objection rule constitutes an adequate and independent state ground. *Williams v. Bagley*, 380 F3d 932, 968 (6th Cir. 2004), *cert. denied*, 125 S.Ct. 1939 (2005).  "Moreover, we view a state appellate court's review for plain error as the enforcement of a procedural default." (citations omitted)).   Further, plain error review by an appellate court constitutes enforcement of Ohio's contemporaneous objection rule. *Id.*

A state procedural bar may be invalidated because of later actions by a state court. *Ylst v. Nunnemaker,* 501 U.S. 797, 801 (1991).  The procedural bar is removed if the last state court to be presented with a particular issue reaches its merits. *Id.*  If the last state court bases its ruling both on the merits and alternatively on a procedural ground, the procedural ground ruling prevails. *Harris v Reed*, 489 U.S. 255, 264 n. 10 (1989); *Baze v. Parker* 371 F3d 310, 320 (6th Cir. 2004), *cert. denied*, 125 S. Ct. 1670 (2005). Where the decision rests primarily on federal law, it is presumed that the state court did not rely on procedural default unless it clearly stated that it did so.  *Harris*, 489 U.S. at 262-63. The question whether a state court relied on procedural default is often a difficult one. *Id*. 489 U.S. at 263.  Therefore, the habeas court must examine the wording used in the state court decision.

Failure to show cause and prejudice for procedural default may be overcome if petitioner

19

can show that his conviction is a result of a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750; *Murray*, 477 U.S. at 496.  This is accomplished by the petitioner demonstrating that he is actually innocent of the crime for which he was convicted. *Schlup v. Delo*, 513 U.S. 298, 316 (1995); *Lott*, 261 F.3d at 602.   Proof of innocense must be so strong that a court cannot have confidence in the outcome of the trial. *Schlup*, 513 U.S. at 316.

When a  defendant was represented by the same counsel at trial and on direct appeal, claims of ineffective assistance of trial counsel are not defaulted because appellate counsel will rarely assert his own ineffectiveness at trial. *Hicks v. Collins*, 384 F.3d 204, 211 (6th Cir. 2004), *cert. denied*, 125 S. Ct. 2260 (2005).

Procedural default may be excused by proving counsel's ineffectiveness in failing to properly raise the claims on direct appeal. *Burroughs v. Makowski*, 411 F.3d 665, 667 (6th Cir. 2005), *cert. denied*, 126 S. Ct. 653 (2005). An ineffective assistance of counsel claim raised as cause for procedural default of another claim can be procedurally defaulted. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Jamison v. Collins,* 100 F. Supp.2d 521, 551 (S.D. Ohio 1998) (a petitioner may not bring an ineffective assistance of counsel claim as cause for a default when that ineffective assistance of counsel claim itself is procedurally barred).   A claim of ineffective assistance of appellate counsel must be raised in a motion for reconsideration in the court of appeals under Rule 26(B). *Monzo v. Edwards*, 281 F.3d 568, 577 (6th Cir. (2002); *Murnahan*, 63 Ohio St. 3d at 65.

Brown states in his Traverse that he will address the procedural default issue in his discussion of each individual claim, but has not done so.  Therefore, the Court has no way of knowing, as to each individual claim, why he believes such claim has not been defaulted.

20

Analysis of Claims for Relief

First, Second and Third Claims for Relief

The first, second and third claims for relief raise the issue of ineffective assistance of counsel.  Since they involve the same issue, they will be discussed together.  None of these claims were presented to the Ohio courts and are procedurally defaulted.  If the Court were to consider these claims, it would find them to be without merit.

In analyzing claims of ineffective assistance of counsel, the Supreme Court has established a two prong test against which counsel's performance must be evaluated.  *Strickland v. Washington*, 466 U.S. 668 (1984).

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* 466 U.S. 687.  A deficient performance occurs when counsel's representation falls below an objective standard of reasonableness.  *Id.* 466 U.S. at 688; *Hicks*, 384 F.3d at 213; *Wickline v. Mitchell*, 319 F.3d 813, 819 (6th Cir. 2003), *cert. denied*, 540 U.S. 955 (2003). Prejudice is established by showing that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is defined as a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694; *Wickline*, 319 F.3d at 819.  Judicial scrutiny of counsel's performance must be highly deferential. *Strickland,* 466 U.S. at 689; *Alder v. Burt,* 240 F. Supp.2d 651, 672 (E.D. Mich. 2003). "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court,

21

examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689.

A defendant is entitled to effective assistance on his direct appeal. The Sixth Circuit, in *Mapes v.Coyle*, 171 F.3d at 408, 428, (6th Cir. 1999), set forth the following factors to aid in determining whether an appellant received effective assistance of counsel on a direct appeal.

(1) Were the omitted issues "significant and obvious"?
(2) Was there arguably contrary authority on the omitted issues?
(3) Were the omitted issues clearly stronger than those presented?
(4) Were the omitted issues objected to at trial?
(5) Were the trial court's rulings subject to deference on appeal?
(6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy     and, if so, were the justifications reasonable?
(7) What was appellate counsel's level of experience and expertise?
(8) Did the petitioner and appellate counsel meet and go over possible issues?
(9) Is there evidence that counsel reviewed all the facts?
(10) Were the omitted issues dealt with in other assignments of error?
(11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

See *Mapes v. Tate,* 388 F.3d 187, 191 (6th Cir. 2004).

First Claim for Relief

In his first ground for relief, Brown claims that his counsel were ineffective for failing to:

a) adequately defend the motion to suppress Brown's statements to police;

b) obtain a trace evidence expert to review findings regarding lead residue on the sleeve

     of

     Allen Thomas's jacket; and

c) investigate and employ a fingerprint and palm print expert to examine Allen Thomas's

     prints.

22

*a.    Motion to Suppress*

Brown allegedly made statements to law enforcement officers when he was incapable of making a voluntary and intelligent waiver of his *Miranda* rights. He had only a tenth grade education and allegedly consumed half of a fifth of gin mixed with orange juice. Tr. Vol. 3, pgs. 87, 89.  Further, he states that he was told that surveillance cameras were on the scene of the murders. Tr. Vol 3, pg. 96.  The court of appeals considered the *Miranda* issue on direct appeal but not as to ineffective assistance of counsel. In this claim he alleges that his counsel were ineffective for not presenting an expert witness at trial to testify as to the effects of Brown's drug and alcohol abuse as they related to his statements to the police, thus preventing him from making a voluntary, knowing, intelligent decision to waive his *Miranda* rights.

> Appellant first argues that he was incapable of making a voluntary, knowing, and intelligent waiver of his *Miranda* rights. In support, appellant points to his youth, limited education, and relative lack of criminal experience. He also maintains that he was under the influence of alcohol and marijuana at the time of questioning. Appellant also argues that he asked for an attorney prior to the waiver and the detectives ignored his request.
>
> The issue of whether appellant knowingly, voluntarily, and intelligently waived his *Miranda* rights is examined against a "totality of the circumstances" standard. *State v. Moore* (1998), 81 Ohio St.3d 22, 31. "Courts are to consider the circumstances surrounding the interrogation, including evaluation of the defendant's age, experience, education, background, intelligence, and capacity to understand the warnings given to him, the nature of his rights and the consequences of waiving those rights." *State v. Burley* (Aug. 11, 1998), Mahoning App. No. 93-CA-204, unreported, 1998 WL 544509 at *7, citing *Fare v. Michael C.* (1979), 442 U.S. 707, 725.
>
> Appellant signed a waiver of *Miranda* rights form. A written waiver is strong proof that the waiver was voluntary. *State v. Cooey* (1989), 46 Ohio St.3d 20, 27, citing *North Carolina v. Butler* (1979), 441 U.S. 369, 373. At the time of questioning, appellant was twenty-one years of age, had attended school to the tenth grade, could read and write, and had been involved in at least three prior felony arrests.
>
> Appellant's testimony that he was under the influence of alcohol and drugs was refuted by testimony from Detective McKnight and Detective Sergeant Maietta. Both detectives testified that appellant did not appear to be under the

influence of alcohol and/or drugs. (Motion to Suppress, p. 22, 74). Detective McKnight testified that appellant was alert and answered questions without any difficulty. (Motion to Suppress, p. 22). Detective Sergeant Maietta testified that appellant was friendly, cognizant, and appeared to understand what they were talking about. (Motion to Suppress, p. 74). Detective McKnight also refuted appellant's claims that he requested an attorney. (Motion to Suppress, pp. 30-32). Based on the testimony of the detectives, there was competent, credible evidence to support the trial court's decision. Although appellant presented conflicting evidence, we are bound by the standard of review that the trial court was in the best position to resolve questions of fact and evaluate the credibility of witnesses. Therefore, we find the trial court did not err in finding that appellant did knowingly, voluntarily, and intelligently waive his *Miranda* rights.

Another issue, distinct from whether there was a valid waiver of rights, is whether appellant gave the confession voluntarily. *Moore,* 81 Ohio St.3d at 31. As before, the "totality of the circumstances" standard governs the inquiry, "including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards* (1976), 49 Ohio St.2d 31, 40-41.

Appellant alleges that the detectives induced his confession with promises of helping with his bond and letting him see his children. However, these allegations were refuted by testimony from Detective McKnight. [FN3] (Motion to Suppress,     pp. 30-53).

FN3. Even assuming the veracity of appellant's claim, we have held that "an agreement to attempt to get bond reduced does not rise to the level of police coercion * * *." *Burley,* 1998 WL 544509 at *7.

Appellant also argues that the detectives deceived him by implying the existence of a videotape of the crime. The Midway Market was equipped with two video cameras connected to recording devices. However, because Salman, a family member, was working in the store, the video recorder was not activated at the time of the shootings. When the detectives questioned appellant, they drew a diagram of the store, pointed out the location of the video cameras, and apparently allowed him to believe that there was a videotape of the entire event. Appellant then told the detectives that he supposed they knew everything. The detectives responded that they did but that they wanted appellant to tell them what happened. Thereafter, appellant confessed to shooting one of the store clerks, Al-Turk, but denied shooting the other, Salman.

Appellant argues that this conduct on the part of the detectives amounted to "cajoled coercion," citing to *State v. Sewell (*Sept. 14, 1990), Mahoning App. No. 89 C.A. 161, unreported, 1990 WL 136576. In that case, the *Sewell* court rendered a confession and waiver involuntary when an officer testified that in conjunction with the reading of the *Miranda* rights to a defendant, he also advised

24

the defendant that "it's better to have your side of the story known in case there is anything we missed, we can talk to those people." *Id.* at *3. The *Sewell* court held this to be "cajoled coercion," finding that the statement created "hope or fear in respect to the crime charged and unconsciously impels a defendant to make a statement." *Id.*, citing *Bram v. United States* (1897), 168 U.S. 532.

Decisions rendered by this court after Sewell have considerably abrogated its holding concerning the voluntariness of confessions. Subsequent to Sewell, we have repeatedly addressed the issue of police promises or misleading statements under the "totality of the circumstances" test approved by the Ohio Supreme Court. *See State v. Gerish* (Apr. 22, 1999), Mahoning App. No. 92 C.A. 85, unreported, 1999 WL 238943; *Burley, supra; State v. Parish* (Apr. 22, 1997), Mahoning App. No. 94-CA-83, *unreported*, 1997 WL 205285; *State v. Reynolds* (Nov. 12, 1996), Mahoning App. No. 93 C.A. 242, *unreported*, 1996 WL 664879; *State v. Eley* (Dec. 20, 1995), Mahoning App. No. 87 C.A. 122, *unreported*, 1995 WL 758808; *State v. Turick* (Sept. 22, 1995), Jefferson App. No. 93-J-54, *unreported,* 1995 WL 562273; *State v. Pue* (July 26, 1995), Mahoning App. No. 92 C.A. 164, unreported, 1995 WL 447668. Furthermore, Sewell relied solely on *Bram*. In *State v. Ward* (July 31, 1996), Lorain App. No. 95CA006214, unreported, 1996 WL 425904 at * 2, the Ninth District Court of Appeals made the following observation concerning how twentieth century jurisprudence has treated *Bram* :

> "Defendant cites *Bram v. United States* (1897), 168 U.S. 532, 42 L.Ed. 568, for the proposition that any promise--"however slight"--renders the confession involuntary. A near century of jurisprudence by the U.S. Supreme Court, as well as the Ohio Supreme Court, has rejected such a 'wooden' interpretation. *See, e.g., State v. Edwards* (1976), 49 Ohio St.2d 31, 40, *vacated on other grounds* (1978), 438 U.S. 911, 57 L.Ed.2d 1155. Rather, both courts have repeatedly declared that each case turns on its own set of special circumstances. *See, e.g., Colorado v. Connelly* (1986), 479 U.S. 157, 93 L.Ed.2d 473.

We acknowledge that deception is a factor bearing on voluntariness. *State v. Wiles* (1991), 59 Ohio St.3d 71, 81. However, this factor, standing alone, is not dispositive of the issue, *id.*, and appellant has not identified other sources of coercion. The key issue is whether a confession arises from the defendant's will being overborne. *Schneckloth v. Bustamonte* (1973), 412 U.S. 218. In those cases that best support appellant's position, the circumstances pointed much more strongly to a false confession dictated by an overbearing of the will through the fear of extraneous adverse consequences for failing to confess. For example, in *Lynumn v. Illinois* (1963), 372 U.S. 528, the defendant confessed only after police repeatedly misrepresented to her that she would lose state financial aid for her children and that her children would be taken from her if she did not cooperate. In *Spano v. New York* (1959), 360 U.S. 315, a police officer whom the defendant knew as a close childhood friend convinced the defendant that the officer might

25

lose his job if the defendant did not cooperate with him by giving a confession. A defendant who is completely innocent might well confess in the circumstances where there is a fear of extraneous adverse consequences. By contrast, an innocent defendant in the circumstances in our case would have little incentive to render a false confession. "A defendant's will is not overborne simply because he is led to believe that the government's knowledge of his guilt is greater than it actually is." *State v. Bays* (1999), 87 Ohio St.3d 15, 23, quoting *Ledbetter v. Edwards* (C.A.6, 1994), 35 F.3d 1062, 1070.

In light of the totality of the circumstances, we find that appellant gave the confession voluntarily. Factors bearing on the voluntariness of appellant's confession include the fact that no physical punishment or threats had been used and that appellant had not been deprived of physical necessities, such as food and drink, restroom facilities, or contact with family members. Moreover, appellant had prior experience with the criminal justice system and was sufficiently intelligent to appreciate the lessons of that experience; had been amply notified of his constitutional rights; and had been questioned for a reasonable period of time. Accordingly, appellant's first assignment of error is without merit.

*State v. Brown,* 2001 WL 103958 at * 3-6 (Ohio App. 7th Dist. Jan 30, 2001).

Pursuant to *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), a person in police custody being interrogated must be warned that he has a right to remain silent, that any statement he makes may be used as evidence against him, and that he has the right to the presence of an attorney.  *Miranda* rights may be waived after the warnings have been received if the waiver is made voluntarily, knowingly and intelligently. *Id.* 384 U.S.  at 444; *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  Whether or not *Miranda* rights have been waived can be determined by answering two questions. "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have

26

been waived." *Moran,* 475 U.S. at 421.  When a person in custody speaks to law enforcement officials with full awareness and understanding of the *Miranda* rights his waiver is knowing and intelligent within the requirements of *Miranda. Slaughter v. Brigano*, 2005 WL 2453092 at * 9 (S.D. Ohio Sept. 30, 2005) (citing *Colorado v. Spring*, 479 U.S. 564, 574-75 (1987)).

The state has the burden of proving by a preponderance that a defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights. *Abela v. Martin,* 380 F.3d 915, 928 (6th Cir. 2004). The Sixth Circuit using a totality of the circumstances test to determine whether a petitioner's statements were involuntary considers factors such as: (1) police coercion; (2) length of interrogation; (3) location of interrogation; (4) continuity of interrogation; (5) the suspect's maturity; (6) the suspect's education; (7) the suspect's physical condition and mental health; and (8) whether the suspect was advised of *Miranda* rights. *Abela,* 380 F.3d at 928 (citing *Withrow v. Williams*, 507 U.S. 680, 693-94 (1993)); *Seymour v. Walker*, 224 F.3d 542, 554 (6th Cir. 2000).

Detective David McKnight testified at the suppression hearing that Brown was "cooperative and alert during the interview." *State v. Brown,* 100 Ohio St.3d 51, 55 (2003), *cert. denied,* 540 U.S. 1224 (2004); *also see*, Tr. Vol. 3, pg. 22. He further testified that he "did not smell alcohol and did not observe anything that would indicate that [Brown] was under the influence of drugs or alcohol." *Id; also see*, Tr. Vol. 3, page 52. Detective Gerald Maietta also testified that Brown "exhibited no signs of being intoxicated or on drugs, but was 'friendly, cognizant, [and] appeared to understand what we were talking about.'" *Id; also see*, Tr. Vol. 3, pg. 74. Neither officer remembered Brown "telling them that he was under the influence of drugs or alcohol." *Id; also see*, Tr. Vol. 3, pgs. 52, 74.

Even if counsel had presented an expert on drug and alcohol abuse, the testimony of the

27

police demonstrated that Brown was not under the influence of drugs and alcohol when he waived his *Miranda* rights so that his statements could be considered voluntary, knowing and intelligently made. Because Brown has not shown that the underlying claim has merit, he has failed to demonstrate that counsel was ineffective in not calling an expert witness to testify as to the effects of his drug and alcohol addiction on his statements to the police.

      b.    *Trace Evidence Expert*

In this sub-claim, Brown contends that trial counsel were ineffective because they failed to obtain a trace evidence expert to review the findings of State witnesses who testified regarding the lead residue on the right sleeve of co-defendant Allen Thomas, also known as "Boonie."  The forensic witness for the state could not determine conclusively if the lead residue was deposited as a result of Boonie firing a gun. If Brown could show that lead residue on Boonie's jacket was caused by the firing of a gun, he could create reasonable doubt whether he was the shooter.

During the guilt phase of the trial, the State's firearms expert, Michael Roberts, testified that he could not determine if the lead residue found on the Boonie's jacket originated from firing a weapon. Tr. Vol. 22, pg. 573.  Even if a trace evidence expert had been hired to examine the jacket, there is still no way to conclusively determine the origin of the lead residue. The Ohio Supreme Court noted in its opinion that two minors, Marcus Clark and Myzelle Arlington, both testified that they saw Brown and Boonie leave the store, but then they saw Brown reenter the store alone wearing a mask or bandanna around his neck. *State v. Brown*, 100 Ohio St. 3d at 52; Apx. Vol. 4, pg. 521; *also see* Tr. Vol. 21, pgs. 240, 312-314 .They further testified that Boonie and his uncle, Gary Thomas, were in the car when they heard gunshots and ran away. *Id*.; *see also* Tr. Vol. 21, pages 236, 315-317. Gary Thomas verified Clark and

Arlington's account of what occurred. *Id.*; *see also* Tr. Vol. 20, pgs. 115-116.

The evidence showed that Boonie was not in the store when the gun was fired. Therefore, Brown's counsel could not be considered ineffective for not investigating whether the lead residue on Boonie's jacket was caused by the firing of the gun that murdered Isam Salman and Hayder Al- Turk.

### c. Fingerprint/Palm Expert

A palm print was found on the murder weapon that the defense's BCI finger print expert testified did not belong to Brown. The identity of the person who left the palm print was not known. Brown argues that his counsel should have obtained Boonie's fingerprints and palm print and submitted them to an independent expert for analysis. Had the jury been presented with Boonie's palm print on the murder weapon, there would have been reasonable doubt as to Brown's involvement in Salman's and Al-Turk's murder.

The State's firearm expert, Michael Roberts, could not conclusively determine if the bullets found at the crime scene were fired from the weapon recovered from Brown. Tr. Vol 22, pg. 534. Even if Boonie's palm print was on the gun in question, that fact would not carry much weight since it could not be conclusively determined if the gun recovered from Brown at the time of his arrest was the actual murder weapon. Further, as previously stated, Boonie was not in the store when the gun was fired, so he could not have been the shooter. Brown's first claim for relief is without merit.

### Second Claim for Relief

Brown's second claim for relief contains two sub-claims. He asserts that his counsel were ineffective in the penalty phase of the trial for failing to:

a. obtain and present expert testimony regarding substance abuse; and

b. obtain and present expert testimony on inner city culture.

*a.*        *Substance Abuse*

In this sub-claim, Brown alleges that the testimony of Dr. Robert L. Smith provided only a cursory evaluation of Brown's substance abuse problem. Because of the obvious effect of drugs and alcohol on Brown, "more specific psychological testimony should have been administered to detect a more elaborate personality profile." Traverse pg. 34. Dr. Smith, a clinical psychologist specializing in alcohol and drug addiction, testified during the penalty phase of the trial. The Ohio Supreme considered his testimony in its independent review. *State v. Brown*, 100 Ohio St.3d at 64. Apx. Vol. 4, pg. 528; Tr. Vol. 28, pgs. 238-42. He stated that Brown began using alcohol and marijuana when he was ten or eleven years old. By late adolescence, he was addicted to alcohol, marijuana, and sedatives. He was also sexually abused when he was six and then became very sexually active around age fifteen. *Id.*; Tr. Vol. 28, pgs. 263-266. Dr. Smith administered several tests on appellant, including the Minnesota Multiphasic Personality Inventory II, the Substance Abuse Subtle Screening Inventory, the Michigan Alcoholism Screening Test, and the Drug Abuse Screening Test. He diagnosed Brown as suffering from substance dependence and a borderline personality disorder. *Id.,* Tr. Vol. 28, pgs. 274-75, 278-80. He further found that Brown suffered from an identity disturbance and effective instability, which is characterized by chronic feelings of emptiness and difficulty controlling anger, coping with life, and trusting others. Dr. Smith testified that appellant had difficulty controlling his impulses, which were intensified by his drug and alcohol abuse. *Id.*; Tr. Vol. 28, pgs. 293-294.

30

Evidence of Brown's substance and alcohol abuse was presented to the jury in some detail. Brown did not suggest what additional information should have been presented that would have been helpful to him. In *Strickland*, 466 U.S. at 689, the Court cautioned that courts must take care to avoid second-guessing strategic decisions that did not prove successful. *Campbell v. Coyle*, 260 F.3d 531, 551 (6th Cir. 2001).  In deciding whether to obtain the services of mental health experts, attorneys generally are not also mental health experts and cannot be expected to second-guess the evaluations rendered by experts.  It does not appear that Brown suffered any prejudice from counsel's failure to obtain another expert to testify about the effect alcohol and drugs had on Brown.

    b.    *Inner City Culture*

Brown's attorneys were allegedly ineffective for failing to obtain an expert to testify as to the inner city culture in which Brown was raised.  This evidence allegedly could have shown that his life style within the inner city culture deprived him of positive influences.

At the mitigation hearing, Brown's mother, Betty Brown, his sister, Michelle Brown and a family friend, Stephanie Johnson, testified about his unstable and chaotic life. Tr. Vol. 27, pgs. 70 -187. Betty Brown used and sold drugs and moved many times leaving Brown with other people such as her sister. *Id.* Brown's mother was incarcerated for selling drugs three times while he was growing up.  *Id.* pgs 146-47.  The jury heard testimony that Brown was neglected, did not have a stable home environment and lived in the inner city projects.  Much of the testimony concerned drug abuse which is common in the inner city.

Stephanie Johnson and Michelle Brown supported Betty Brown's testimony that she used drugs heavily and frequently. She moved residences requiring someone to take care of her

31

children.  Tr. Vol. 27, pgs. 194-200; Tr. Vol. 28, pgs. 219-20   Johnson remarked that because of her absence, Betty Brown did not provide a stable life for her son. Tr. Vol. 27, pg. 205.

      Brown's counsel does not indicate how testimony about inner city culture, other than that it deprived Brown of positive influences, could have helped Brown. This argument amounts to the  second-guessing prohibited by *Strickland*.

Third Ground for Relief

      In his third claim for relief, Brown alleges that his counsel were ineffective because they failed to:

      a. obtain and present expert reports and evaluations for the mitigation phase;

      b. interview family and friends in preparation for mitigation; and

    c. obtain and present expert testimony on gang membership for the mitigation phase.

      *a.*      *Mitigation Reports and Evaluations*

      Brown contends that his counsel did not make a complete determination after proper investigation of necessary reports and evaluations from appropriate experts. There is no further explanation of what additional experts should have been consulted.  As noted above, Dr. Robert L. Smith, a clinical psychologist, testified about alcohol and drug abuse as it pertained to Brown after interviewing him and conducting psychological tests.  He diagnosed Brown as suffering from substance dependence and a having a borderline personality disorder. Tr. Vol. 28, pgs. 278-80.  Also a social worker, Martha Jacoby, was hired to gather background information regarding the family. Tr. Vol. 28, pg. 299. This claim is without merit.

      *b.*      *Interview Family and Friends*

      Brown claims that his counsel failed to interview family and friends to prepare for the

32

mitigation phase of the trial. The record shows that his counsel called several mitigation witnesses including his mother, sister and a family friend. The social worker interviewed other members of Brown's family, including his aunt and uncle, although there may have been some question whether this actually occurred. Tr. Vol 28, pg. 314.  Again, this argument amounts to the second-guessing prohibited by *Strickland*.

     *c.*     *Expert on Gangs*

The State called Brown's mother, Betty Brown, as a rebuttal witness. During that testimony, Brown's membership in a gang was elicited. Tr. Vol. VI, pg. 1129.  Brown argues that testimony connecting him to gang membership should have caused his counsel to present expert testimony on gang membership, gang culture, and the effects gang membership would have on a youthful Brown.

The Ohio Supreme Court held that Brown's mother should not have been allowed to testify as to Brown's membership in the "Baby Crips" while living in California because the testimony was irrelevant and portrayed him in a negative light. *State v. Brown*, 100 Ohio St.3d at 57.  The court held this to be harmless error.  Brown's counsel may have decided not to concentrate on this fact because it would have highlighted his life of crime. Instead, counsel focused on mitigating factors such as Brown's unstable life.  Again, this argument amounts to the  second-guessing prohibited by *Strickland*.

The Court concludes that there is no merit to Brown's third claim for relief.

Fourth Claim for Relief

In his fourth claim for relief, Brown asserts that the trial court wrongfully permitted the State to introduce prejudicial evidence of his robbing Steve Jones at gunpoint, taking his car and

33

Glock 9-mm pistol, the murder weapon.  The Ohio Supreme Court determined this issue as

follows:

> In proposition of law III, appellant argues that the trial court erred and denied him a fair trial by allowing the prosecution to introduce "other acts" testimony. In particular, appellant maintains that the trial court should not have allowed witness Steve Jones to testify that appellant robbed him of his Glock 9-mm gun, which was later identified as the murder weapon. . . .
>
> Evid. R. 404(B) provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
>
> With respect to Jones's testimony that appellant robbed him of his Glock 9-mm gun, the trial court instructed the jury that his testimony "may be considered for the purpose of determining the proof of the identity of the defendant. Said evidence may not be considered as proof that the defendant committed the robbery of Steve Jones or of the character of the defendant." At the close of the trial, the court reiterated to the jury that the evidence could be used to prove only the defendant's identity.
>
> Evid.R. 404(B) clearly allows "other acts" evidence as proof of identity. *State v. Allen* (1995), 73 Ohio St.3d 626, 632, 653 N.E.2d 675. Jones's testimony was used as proof of identity in that it clearly helped link appellant to the gun found in his possession when he was arrested.
>
> Appellant asserts that identity was not at issue, since he had already admitted to killing one of the store clerks. Thus, appellant maintains that the "other acts" testimony was unnecessary to prove identity. This argument lacks merit. As stated in *State v. McNeill* (1998), 83 Ohio St.3d 438, 442, 700 N.E.2d 596, need is irrelevant in determining the validity of an Evid.R. 404(B) objection. Moreover, the trial court minimized the likelihood of undue prejudice by giving limiting instructions to the jury to alert them to the narrow purpose of admitting such evidence. We consequently find that the trial court did not abuse its discretion in admitting this "other acts" testimony.

*State v. Brown*, 100 Ohio St.3d at 56-57; Apx. Vol. 4, pgs. 523-24.

A federal court will not reverse a state conviction based on the belief that the trial judge

incorrectly interpreted state law unless the evidence admitted by itself so infected the entire trial

that the resulting conviction violated due process.  *Estelle v. McGuire*, 502 U.S. 62, 71 (1991);

*Coleman*, 244 F.3d at 542 .  Errors by a state court in the admission of evidence in a criminal

34

case are not cognizable in habeas corpus proceedings unless they result in a denial of the fundamental right to a fair trial. *Terry v. Bock*, 208 F.Supp.2d 780, 791 (E.D. Mich. 2002), *aff'd.*, 79 Fed. Appx. 128 (6th Cir. 2003), *cert. denied,* 541 U.S. 961 (2004).

Brown argues that admittance of this evidence was unfair because there was no evidence identifying Brown with Jones at the time of the robbery. The Court agrees with the Respondent's argument that the other acts evidence linked Brown to the murders and tended to show his identity as the killer.  Brown obtained the murder weapon from Jones during that robbery.  The Court finds that the decision of the Ohio court was not contrary to or an unreasonable application of constitutional law as determined by the U.S. Supreme Court.

### Fifth Claim for Relief

The jury returned a sentencing verdict of death for the murder of Isam Salman and life imprisonment for the murder of Hayder Al-Turk. Brown contends that the verdicts, based on the same facts, are excessive and disproportionate. The fact that Brown would be sentenced to die in one count and receive a life sentence in an in identical count allegedly undeniably speaks of disproportionality[3].  This claim was not presented to the state courts and is procedurally defaulted. If the Court were to consider this claim, it would find it to be without merit.[4]

Generally, a claim of inconsistent verdicts is not reviewable in habeas corpus. *House v. Miller*, 2003 WL 23198788 * 16 (E.D. N.Y. Oct. 27, 2003). "Consistency in the verdict is not necessary."  *Cardell v. Fischer*, 2004 WL 2070820 * 3 (E.D.N.Y. Sept. 14, 2004) (quoting *Dunn v. United States,* 284 U.S. 390, 393 (1932)). *See United States v. Powell*, 469 U.S. 57, 64 (1984).

---

[3]   Brown's argument that the verdicts are disproportionate and inappropriate do not seem suitable for the issue apparently raised.

[4]   Brown raised the issue of proportionality in the state court but not as to inconsistent verdicts.

While symmetry of results may be intellectually satisfying, it is not required. *Standefer v. United States*, 447 U.S. 10, 25 (1980).

The jury's recommendation of a death sentence for the aggravated murder of Isam Salman and a life sentence for the aggravated murder of Hayder Al-Turk did not violate Brown's rights. The Ohio court of appeals and the Ohio Supreme Court independently reweighed the appropriateness of Brown's sentence as required by statute. They found, after reviewing the evidence in mitigation, that the aggravating factors outweighed the mitigating circumstances beyond a reasonable doubt. *State v. Brown,* 2001 Wl 103958 at * 30-37; *State v. Brown*, 100 Ohio St.3d at 63-65.  This claim is without merit.

Sixth Claim for Relief

Brown raises numerous reasons why Ohio's death penalty scheme is unconstitutional. The Respondent agrees that all of them have been presented to the State court and are therefore preserved for federal habeas review. Most, if not all, of these sub-claims have already been rejected by the Sixth Circuit.

a.      *Cruel and Unusual Punishment*

In *Gregg v. Georgia*, 428 U.S. 153, 179 (1976), the Supreme Court rejected the argument that the death penalty is cruel and unusual punishment. The most marked indication of society's endorsement of the death penalty for murder is the legislative response to the Supreme Court's decision in *Furman v. Georgia*, 408 U.S. 238 (1972). Since *Furman*, the legislatures of at least 35 states have enacted new statutes that provide for the death penalty for at least some crimes that result in the death of another person.  The Congress of the United States, in 1974, enacted a statute providing the death penalty for aircraft piracy that results in death. These statutes have

36

attempted to address the concerns expressed by the Court in *Furman* primarily (i) by specifying the factors to be weighed and the procedures to be followed in deciding when to impose a capital sentence, or (ii) by making the death penalty mandatory for specified crimes. But all of the post-*Furman* statutes make clear that capital punishment itself has not been rejected by the elected representatives of the people. *Gregg*,  428 U.S. at 179-81. Ohio's death penalty statutes satisfy the concerns identified in *Furman*

   b.  *Death Penalty Applied in Arbitrary and Capricious Fashion*

  In *Gregg*, 428 U. S.  at 188, the Supreme Court set forth the following capital sentencing procedures likely to prevent arbitrary and capricious imposition of the death penalty: (1) consideration of a pre-sentence report by the sentencing authority; (2) jury sentencing where the jury is adequately informed and given meaningful standards to guide its use of the information; (3) a bifurcated guilt phase/sentencing phase trial; (4) weighing of aggravating circumstances and mitigating factors; (5) a sentencing decision based on specific findings; and (6) meaningful appellate review.  Ohio's death penalty statutes contain these preventative sentencing procedures.  *Buell*, 274 F.3d at 367.  *See Bryd v. Collins*, 209 F.3d 486, 539 (6th Cir. 2000).

   c.  *Death Penalty Scheme Does Not Require Premeditation or Deliberation*

  Ohio Revised Code Section 2903.01(E) provides that "no person shall be convicted of aggravated murder unless the person is specifically found to have intended to cause the death of another..."   The Constitution does not require a premeditated and conscious desire to kill before a death sentence can be imposed. *Tison v. Arizona*, 481 U.S. 137, 158 (1986); *Hartman v. Bagley*, 333 F. Supp.2d 632, 677 (N.D. Ohio 2004).  Reckless indifference is an acceptable level of culpability to impose the death penalty.  *Tison*, 481 U.S. at 156.

     d.     *No Standard of Proof for Determining Existence Mitigating Factors*

A state court is required to disclose to a reviewing court the considerations which motivated the death penalty whenever it is imposed. *Gardner v. Florida*, 430 U.S. 349, 361 (1977).  However, there is nothing requiring the trial judge or jury to disclose the factors used to devise the decision. *Wiles v. Bagley*, 2005 WL 1181859 * 42 (N.D. Ohio May 18, 2005). The trial court satisfies this requirement by making a written finding as to the existence of specific mitigating factors and aggravating circumstances and why the aggravating circumstances outweigh the mitigating factors. R.C. 2929.03(F).  *Id.*

     e.     *No Standard With Which to Balance the Mitigating Factors Against the*
                *Aggravating Factors*

According to the Supreme Court, "the Eighth Amendment does not require states to adopt specific standards for instructing juries on mitigating circumstances." *Buchanan v. Angelone*, 522 U.S. 269, 274 (1998).  Thus, the absence of any standard to balance the weight of mitigating circumstances with aggravating circumstances is inconsequential. *Dickerson v. Mitchell*, 336 F. Supp.2d 770, 791 (N.D. Ohio 2004); *Hartman*, 333 F. Supp.2d at 675; *Madrigal v. Bagley*, 276 F. Supp.2d 744 (N.D. Ohio 2003), *aff'd.*, 413 F.3d 548 (6th Cir. 2005).

     f.     *Aggravating Circumstances at Guilt Phase*

In *Coleman v. Mitchell*,  268 F.3d 417, 443 (6th Cir. 2001), the Sixth Circuit held that Ohio's scheme is consistent with *Lowenfield v. Phelps*, 484 U.S. 231, 244-45 (1988), wherein the Supreme Court stated:

> The use of "aggravating circumstances" is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion. We see no reason why this narrowing function may not be performed by jury findings at either the sentencing

phase of the trial or the guilt phase.

g.    *Ohio's Death Penalty Scheme Treats Felony-Murders More Harshly Than Premeditated Murders.*

Based on *Tison* which held that the imposition of the death penalty on felony murders is not unconstitutional, the Court finds that there is no merit to this claim, the adjudication of which did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. *Hartman*,  333 F.Supp. at 678*; Keene v. Mitchell,* 2004 WL 3325797  * 77 (S.D. Ohio Aug. 25, 2004); *See Frazier v. Mitchell*, 188 F. Supp.2d 798, 842 (N.D. Ohio 2001),*rev'd in part on other grounds by Frazier v. Huffman,* 343 F.3d 780 (6th Cir. 2003), *cert. denied*, 541 U.S. 1095 (2004)(treatment of death penalty murders more harshly than premeditated murders not unconstitutional because R.C. § 2929.04(A)(7) sufficiently narrows the class of homicides).

h.    *Death Penalty is Mandatory*

A sentencer is constitutionally required to have information sufficient to enable it to consider the character and individual circumstances of a defendant prior to the imposition of the death sentence.  *Buell*, 274 F.3d at 368 (citing *Sumner v. Shuman,* 483 U.S. 66, 72 (1987)).  A sentence of death is not automatically imposed depending on certain types of murder.  *Blystone v. Pennsylvania*, 494 U.S. 299, 305 (1990).  As long as a death penalty is imposed after a determination that the aggravating circumstances outweigh the mitigating circumstances present in the particular crime committed by the particular defendant or that there are no mitigating circumstances, the sentence is constitutional.  *Id.*; *Buell*, 274 F.3d at 368; *Wiles*, 2005 WL 1181859 at * 42.

i.      *Bifurcated Trial Denies Impartial Jury and Effective Assistance of Counsel*

Death penalty statutes should be drafted in a manner that ensures that the sentencing authority is given adequate information and guidance. This is best accomplished by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and is provided with standards to guide its use of the information. *Gregg,* 428 U.S. at 195.

Although two hearings are required, there is no requirement that the same jury sit for both hearings. *Lockhart v. McCree*, 476 U.S. 162, 174-77 (1986). The Supreme Court has upheld against constitutional attack the Georgia capital sentencing plan which provided that the same jury must sit in both phases of a bifurcated capital murder trial. *Id*. 476 U.S. at 179-80. The Supreme Court stated that it is "unwilling to say that there is any one right way for a State to set up its capital sentencing scheme." *Spaziano v. Florida*, 468 U.S. 447, 464 (1984). *See Hartman,* 333 F. Supp.2d at 675.  In fact, the Court in *Lockhart* noted that a defendant may even benefit at the sentencing phase from any "residual doubts" that the jury might have had during the guilt phase and the evidence in both trials would be repetitive which might not be consistently fair to the State and perhaps not even to the accused. *Lockhart*, 476 U.S. at 180-81.

j.      *Ohio Criminal Rule 11(3)(c) Encourages Guilty Pleas*

Ohio Criminal Rule 11(C)(3) allows a judge, in the interest of justice, to dismiss capital specifications if the defendant pleads guilty or no contest.  The specifications are not automatically dismissed.  If the judge does not dismiss the specifications, the rule requires three judges to determine if the offense was aggravated murder and, if so, they must determine the presence or absence of the specified aggravating circumstances, if any, compared to any

40

mitigating circumstances and impose sentence accordingly.  In *United States v. Jackson*, 390 U.S. 570 (1968), the Supreme Court held unconstitutional a statute that automatically dismissed the capital specifications when a defendant plead guilty or waived a jury. The death penalty could be imposed if recommended by a jury, but the statute did not include a procedure for imposing the death penalty on a defendant who waived a jury or pled guilty.  However, the Supreme Court has never decided that a statute allowing a defendant to avoid the possibility of a death sentence with a guilty plea was invalid.  *Benge v. Johnson,* 312 F. Supp.2d 978, 1033-34 (S.D. Ohio 2004); *Frazier,* 188 F.Supp. at  839, *Jamison*, 100 F. Supp.2d at 763.  There is no *per se* rule against encouraging guilty pleas.  *Benge*, 312 F. Supp.2d at 1034 (citing *Corbitt v. New Jersey*, 439 U.S. 212, 223 (1978)).  Under Ohio Criminal Rule 11(C)(3), a defendant who pleads guilty to an indictment containing a death penalty specification can still receive the death penalty. *Id.*  The Sixth Circuit has rejected the same argument.  *See Cooey v. Coyle*, 289 F.3d 882, 924-25 (6th Cir. 2002), *cert. denied,* 538 U.S. 947 (2003).

      *k.*     *Elimination of Sentencing Discretion*

      A sentencer is constitutionally required to have information sufficient to enable it to consider the character and individual circumstances of a defendant prior to the imposition of the death sentence.  *Buell*, 274 F.3d at 368 (citing *Sumner,* 483 U.S. at 72).  A sentence of death is not automatically imposed depending on certain types of murder.  *Blystone*, 494 U.S. at 305.  As long as a death penalty is imposed after a determination that the aggravating circumstances outweigh the mitigating circumstances present in the particular crime committed by the particular defendant or that there are no mitigating circumstances, the sentence is constitutional. *Id.*; *Buell*, 274 F.3d at 368; *Wiles*, 2005 WL 1181859 at * 42.

     *l.*    *Mandatory Death Recommendation*

This sub-claim is similar to the previous sub-claim.  It was rejected by the Sixth Circuit in *Buell*, 274 F.3d at 368. *Byrd,* 209 F.3d at 527. Petitioner challenges instructions which stated that the jury's verdict was only a recommendation, that the jury was to consider all statutory mitigating factors, and that if the aggravating circumstances outweighed the mitigating factors, a recommendation of death was mandatory. These challenges are without merit as well. These instructions reflect Ohio statutory law. The Constitution does not require that a sentencer impose life even where the aggravating circumstances outweigh the mitigating factors, or where there are no mitigating factors. *Benge,* 312 F. Supp.2d at 1036 (citing *Boyde v. California*, 494 U.S. 370, 377 (1990)).

     *m.*    *Failure to Provide Equal Protection to Persons Convicted of Similar Crimes*

Brown has not explained his reasoning as to this sub-claim. Apparently, he is complaining that Ohio's death penalty statutes are unconstitutional because they are disproportional to the punishment imposed on others convicted of the same crime. If so, this sub-claim is without merit because no proportionality review is required.  *Buell*, 274 F.3d at 368 (citing *Pulley v. Harris*, 465 U.S. 37, 44-51 (1984)).  Since Ohio law requires proportionality review, the review must be consistent with constitutional requirements.  *Dickerson*, 336 F. Supp.2d at 789.  A trial judge has the duty to reweigh the aggravating circumstances and mitigating circumstances before determining whether to impose a death sentence or a life sentence, R.C. § 2929.03(D)(3), and to state this finding in a separate opinion.  R.C. § 2929.03(F).  The judge must examine the state's proportionality review to determine whether the imposition of a death sentence on the petitioner is patently unjust or "shocks the conscience."

The court is not to second guess the state court's comparison of other cases in which the death penalty was imposed. *Id.*; *Taylor v. Mitchell*, 296 F. Supp.2d 784, 839 (N. D. Ohio 2003). Because proportionality review is not required by the constitution, states have a great latitude in defining the pool of cases used for comparison. *Wickline*, 319 F.3d at 824. The Sixth Circuit has held that by limiting proportionality review to previous cases wherein the death penalty has been imposed, the Ohio Supreme Court has complied with the latitude allowed. *Id.* 319 F.3d at 824; *Buell*, 274 F.3d at 369.

        n.        *Ohio's Death Penalty Statute is Applied in an Arbitrary and Discriminatory Manner*

Brown has not explained his reasoning as to this claim. If he is contending that Ohio's death penalty scheme is unconstitutional because it imposes the death penalty in a racially discriminatory manner, this sub-claim has no merit. Brown must prove the existence of purposeful discrimination, i.e., that the decisionmakers in his case acted with discriminatory purpose. *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987). *See Wiles*, 2005 WL 1181859 at * 43. The Sixth Circuit has rejected challenges claiming that race is a factor in the application of the death penalty in Ohio. *Greer v. Mitchell*, 264 F.3d 663, 690 (6th Cir. 2001)(petitioner failed to show a constitutionally significant risk of racial bias affecting Ohio's death penalty statute). The court in *McCleskey*, 481 U.S. at 297, stated: "[b]ecause discretion is essential to the criminal process, we would demand exceptionally clear proof before we would infer that the discretion has been abused." McCleskey presented to the Court a statistical study of the affect of race on the imposition of the death penalty. In Georgia, the prosecution sought the death penalty for 70% of black defendants with white victims but for only 19% of white defendants with black

43

victims.  *McCleskey* held that a capital defendant must show that the discriminators in the defendant's case acted with a discriminatory purpose.  *Id.* 481 U.S. at 292; *Wiles*, 2005 WL 1181859 at * 43.

There is no evidence that race was involved in Brown's sentence.

>    o.      *No Compelling State Interest*

The Court in *Gregg* rejected this argument, finding that the death penalty serves compelling state interests and is not "invariably disproportionate to the crime" of murder. *Gregg,* 428 U.S. at 183, 187; *Williams,* 380 F.3d at 966; *Greer*, 264 F.3d at 690; *Madrigal,* 276 F. Supp.2d at 809.

>    p.      *Preponderance of Evidence in Mitigation Phase*

In *Walton v. Arizona*, 497 U.S. 639, 649-51 (1990), *overruled on other grounds by Ring v. Arizona,* 536 U.S. 584, (2002), the Supreme Court wrote:

> So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency.

*Id*. 497 U.S. at 650. The prosecution must prove beyond a reasonable doubt that any aggravating circumstances outweigh any mitigating factors. In addition, Ohio allows capital defendants "great latitude" in presenting mitigating evidence. *See* Ohio Rev.Code § 2929.03(D)(1). *Jamison,* 100 F. Supp.2d at 764-65. Further, in  *Buchanan*, 522 U.S. at 275-76, the Supreme Court held that the Eighth Amendment does not require the jury to be instructed on the concept of mitigating evidence or on particular statutory mitigating factors, and that states are free to structure the jury's consideration of mitigation so long as it does not preclude the jury from

giving effect to it. *Smith v. Mitchell,* 348 F.3d 177, 214 (6th Cir. 2004), *cert. denied*, 125 S. Ct. 278 (2004).

      *q.*     *No Meaningful Appellate Review/No Proper weighing and Consideration in Mitigation*

After the sentencer has found that a defendant convicted of aggravated murder is eligible for the death penalty because one or more aggravating circumstances have been found beyond a reasonable doubt, a separate review of whether the aggravating circumstances outweigh the mitigating factors is conducted to determine the appropriateness of the death penalty. *Buell,* 274 F.3d at 368. In cases involving offenses committed prior to January 1, 1995, both the court of appeals and the Ohio Supreme Court are required to review the trial court's decision and also independently determine whether the sentence is proportionate, non-excessive and appropriate in accordance with the aggravating circumstances and mitigating factors. In offenses committed after that date, the Ohio Supreme Court has the sole responsibility. This requirement gives the sentencing authority sufficient information to enable it to consider the character and individual circumstances of the defendant. The court in *Buell,* 274 F.3d at 368-69, found that this procedure sufficiently discerns who deserves the death penalty. *Benge*, 312 F.Supp.2d at 1035-36; *Jamison*, 100 F. Supp.2d at 765-66.

The Court finds that Ohio's death penalty statutes are constitutional and not contrary to nor do they involve an unreasonable application of clearly established constitutional law as determined by the United States Supreme Court.

Seventh Claim for Relief

In his seventh claim for relief, Brown contends that his conviction for murdering Isam

45

Salam was supported by insufficient evidence in that there was no proof of his intent to murder

Isam Salam.  This claim was not presented to the Ohio courts and is therefore procedurally

defaulted. If the Court were to consider this issue, it would find it to be without merit.

A conviction is supported by sufficient evidence if, after viewing the evidence and the

inferences to be drawn therefrom in the light most favorable to the prosecution, the court can

conclude that any rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979).  A federal court

cannot make its own subjective determination of guilt or innocence.  The trier of fact has the

responsibility to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable

inferences from the basic facts to the ultimate facts.  *Herrera v. Collins*, 506 U.S. 390, 401-402

(1993). This due process guarantee of sufficiency of the evidence extends only to facts needed to

establish the elements of the crime and not to the state's burden to prove the absence of an

affirmative defense. *Allen v. Redman*, 858 F.2d 1194, 1197-98 (6th Cir. 1988).

While playing cards, Brown pulled out a gun and put it back in his coat or pants pocket.

He stated that he wanted to copy a scene from a movie where assailants robbed and killed two

Oriental store clerks. Later that night when Brown, Boonie and Thomas went to buy drinks,

Brown and Boonie went into the store and were seen leaving by witnesses. Brown then went

back into the store, wearing a mask or bandana around his neck. Gunshots were heard. Before

going back into the store, Brown said, "I forgot to do something." Brown stated when asked by

Thomas what went on in the store, "Oh that wasn't nothing but some firecrackers."  The Court

concludes that reasonable jurors could have found that Brown intended to murder someone.

Eighth Claim for Relief

46

In his eighth claim for relief, Brown asserts that he was deprived of his rights under the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments when the trial court gave an improper instruction to the jury at the penalty phase that coerced the jury into reaching a verdict.  The Respondent agrees that this claim was presented to the Ohio courts and is therefor reviewable in habeas corpus.

On the third day of the penalty phase of the trial, the jury announced that it could not reach an agreement on one of the two counts. The judge then gave a *Howard* charge. *State v. Howard*, 42 Ohio St.3d 18 (1989). Brown contends that this charge encouraged the jurors to reach a verdict without allowing them not to reach a verdict if they could not. Further, the *Howard* charge allegedly urged the jurors to abandon their views in favor of the majority. Thirteen hours after the *Howard* charge was given, in announcing their verdict, one of the jurors stated that she had compromised with the other jurors.  The judge sent the jurors back into the jury room. About two and one half hours later, they returned with a unanimous verdict. After polling the jurors, they all stated without reservation that it was their verdict. Brown alleges that the judge failed to provide a correct supplemental jury charge.

The Ohio Supreme Court ruled on this issue as follows:

> In proposition of law I, appellant argues that the trial court erred in failing to give the correct supplemental instruction to the deadlocked jury in the penalty phase. Alternatively, appellant contends that the court should have declared a mistrial, discharged the jury, and sentenced him to life imprisonment.
> The jury underwent lengthy penalty deliberations and was, for a time, deadlocked. The jury began deliberating at 12:10 p.m. on February 22, 1996, and retired for the day at 6:35 p.m. The jury resumed deliberations the next day at 9:05 a.m. At 2:20 p.m., the jury informed the court that it had "come to an agreement on one recommendation. We cannot agree on the other; we're deadlocked * * *." At this point, the court issued a supplemental instruction, referred to as a *Howard* charge (slightly modified from the charge in *State v. Howard* [1989] 42 Ohio St.3d 18, 537 N.E.2d 188). n1 The instruction advised the jurors:

47

"It is your duty to decide the case, if you can conscientiously do so. You should listen to one another's arguments with the disposition to be persuaded. Do not hesitate to reexamine your views and change your position if you are convinced that it is erroneous. If there is disagreement, all jurors should reexamine their positions, given that a unanimous verdict has not been reached. Jurors for life should consider whether their doubt is reasonable, considering that it is not shared by others, equally honest to have heard the same evidence, with the same desire to arrive at the truth, and under the same oath. Likewise, jurors for death should ask themselves whether they might not reasonably doubt the correctness of a judgment not concurred in by all other jurors."

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1. The *Howard* charge was modified by the judge so that the words "jurors for acquittal" were changed to "jurors for life." Also, the term "death" was substituted for "guilt."

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Defense counsel objected to the *Howard* charge and requested that the court read a different supplemental instruction taken from *State v. Martens* (1993), 90 Ohio App.3d 338, 629 N.E.2d 462, which discussed the impossibility of reaching a verdict. The *Martens* charge, which is reflected in *4 Ohio Jury Instructions (2000), Section 415.50(4)*, instructs the jury: "If you decide that you cannot agree and that further deliberations will not serve a useful purpose you may ask to be returned to the courtroom and report that fact to the court. If there is a possibility of reaching a verdict you should continue your deliberations." *Id.* at 343, 629 N.E.2d 462. The court refused to give this instruction.

Nearly four hours after the court read its *Howard* charge, defense counsel, arguing that the jury was irreconcilably deadlocked, moved for a mistrial under *State v. Springer* (1992), 63 Ohio St.3d 167, 586 N.E.2d 96. In *Springer*, we held that "when a jury becomes irreconcilably deadlocked during its sentencing deliberations in the penalty phase of a capital murder trial and is unable to reach a unanimous verdict * * *, the trial court is required to sentence the offender to life imprisonment." *Id.* at syllabus. The trial court overruled the motion for mistrial. The jury continued deliberating until 9:08 p.m. that day.

The next day, February 24, 1996, the jury reconvened at 10:30 a.m. Defense counsel requested that the court either instruct the jury to "move on" and consider one of the life-sentence options or give the *Martens* charge. The court refused. About three hours later, with the jury still deliberating, defense counsel repeated the request. Again the court declined.

At 4:35 p.m., between 12 and 13 hours after the court read its *Howard* charge, the jury announced its verdict. The jurors recommended that appellant

48

receive the death sentence for the murder of Isam Salman and life imprisonment for the murder of Hayder Al Turk with parole eligibility after 30 years. When the jury was polled, Juror York stated, "Your Honor, I compromise with the other eleven jurors [sic]." The court then asked her, "Are these your verdicts?" Juror York answered, "No, they're not." The court repeated, "These are not your verdicts?" She answered, "I compromised, Your Honor, with the other jurors."

The court then sent the jurors back into the jury room. Defense counsel moved for a mistrial or, in the alternative, for a *Martens* charge. The judge declined, but decided to reread the penalty instructions in their entirety to the jury, but without the *Howard* charge. Approximately two and one-half hours later, the jurors reached a unanimous verdict and, when polled, all jurors, including York, stated without reservation that it was their verdict.

In this proposition of law, we are asked to decide whether the trial court abused its discretion in giving the *Howard* charge rather than the *Martens* charge, and erred in failing to remove the case from the jury and sentencing Brown to life imprisonment. Whether the jury is irreconcilably deadlocked is essentially "a necessarily discretionary determination" for the trial court to make. *Arizona v. Washington* (1978), 434 U.S. 497, 510, 98 S. Ct. 824, 54 L. Ed. 2d 717, fn. 28. In making such a determination, the court must evaluate each case based on its own particular circumstances. *State v. Mason* (1998), 82 Ohio St.3d 144, 167, 1998 Ohio 370, 694 N.E.2d 932. There is no bright-line test to determine what constitutes an irreconcilably deadlocked jury. In fact, we have stated that "no exact line can be drawn as to how long a jury must deliberate in the penalty phase before a trial court should instruct the jury to limit itself to the life sentence options or take the case away from the jury, as done in *Springer*." *Mason* at 167, 694 N.E.2d 932.

In this case, although the jury deliberated for many hours, we are unwilling to find that the trial court abused its discretion in finding that the jury was not irreconcilably deadlocked and in choosing to issue a *Howard* rather than a *Martens* charge. We have twice upheld the use of a *Howard* charge, specifically finding that such an instruction is not coercive, and, in fact, is "intended for a jury that believes it is deadlocked, so as to challenge them to try one last time to reach a consensus." *State v. Robb* (2000), 88 Ohio St.3d 59, 81, 2000 Ohio 275, 723 N.E.2d 1019; see, also, *Mason*, 82 Ohio St.3d at 167, 694 N.E.2d 932. In this case, even though the jurors deliberated for a lengthy period of time, they never advised the court, after their initial deadlock, that they were unable to reach a verdict. Thus, the court acted within its discretion in refusing to give the *Martens* instruction regarding the impossibility of reaching a verdict. Even the *Martens* court itself, in refusing to require the instruction in that case, acknowledged that such an instruction should not be given prematurely. Otherwise, "the instruction may be contrary to the goal of the *Howard* charge of encouraging a verdict where one can conscientiously be reached." *Martens*, 90 Ohio App.3d at 343, 629 N.E.2d 462.

As to the trial court's refusal to declare a mistrial under *Springer*, again,

49

we find no abuse of discretion. In *Springer,* it was evident that the jury was irreconcilably deadlocked on sentencing. On the second day of deliberations, the jury informed the judge that it was "stalemated." *Id.* at 168, 586 N.E.2d 96. The court then gave the jury a supplemental charge similar to the *Howard* charge. Deliberations continued into the third day. The jurors queried the judge several more times, again indicating that they were still struggling against a stalemate. The jury informed the court on the third day of deliberations that it was hopelessly deadlocked and could not recommend any sentence, and they were discharged. In contrast, after hearing the *Howard* charge, the jury in this case, unlike the jury in *Springer*, made no further inquiries to the court. It never informed the court that they continued to be deadlocked. Instead, even after the polling of the jury, the jurors continued their deliberations without hesitation. The trial court was justified in refusing to give the *Martens* charge, since there was no clear indication that the jurors would be unable to reach a verdict. For these reasons, we overrule proposition of law I.

Allegedly Compromised Jury Verdict

In proposition of law II, appellant argues that the trial court should have declared a mistrial when juror York stated that her verdict had been compromised. At the least, appellant contends that the court should have questioned the juror further after hearing that her verdict was compromised. See *State v. Brumback* (1996), 109 Ohio App.3d 65, 73-74, 671 N.E.2d 1064.

R.C. 2945.77 and Crim.R. 31(D) provide for the polling of the jury to determine whether there is a unanimous verdict. In particular, R.C. 2945.77 provides: "If one of the jurors upon being polled declares that said verdict is not his verdict, the jury must further deliberate upon the case." Crim.R. 31(D) states, "If upon the poll there is not unanimous concurrence, the jury may be directed to retire for further deliberation or may be discharged."

The determination of whether to grant a mistrial is within the sound discretion of the trial court. *State v. Glover* (1988), 35 Ohio St.3d 18, 19, 517 N.E.2d 900. In deciding whether there has been an abuse of discretion, we are cognizant of the fact that the trial judge remains in the best position to view the demeanor and actions of the juror to determine whether further questioning is necessary. *Id.* at 20, 517 N.E.2d 900. We will not second-guess that determination absent an abuse of discretion. See *State v. Williams* (1995), 73 Ohio St.3d 153, 167, 1995 Ohio 275, 652 N.E.2d 721.

Although the better practice would be for the trial judge to conduct further inquiry of a dissenting juror, see, e.g., *State v. Hessler* (2000), 90 Ohio St.3d 108, 115-122, 2000 Ohio 30, 2000 Ohio 31, 734 N.E.2d 1237, neither the Criminal Rules nor the statute mandates further questioning. Nor does the fact that Juror York expressed reservation necessitate the granting of a mistrial or reversal of the verdict. The *Hessler* decision exemplifies this point. In *Hessler*, after signing the penalty form, a juror was visibly upset, crying in the hallway and refusing to go into the courtroom. The trial judge questioned the juror in his chambers and informed her that she was free to change her mind if she felt that her vote had

50

been coerced. Following the inquiry, when polled, the juror stated that she agreed with the recommendations. In finding no error in the judge's approach, we noted that the juror was given the chance to change her mind, but when she was individually polled, she stated that she agreed with the recommendation. Under those circumstances, we held that the trial court did not abuse its discretion in proceeding as it did. *Id.*, 90 Ohio St.3d at 115-121, 734 N.E.2d 1237.

Even though the trial court in this case did not question Juror York further, we do not find that the trial court abused its discretion. Unlike the distraught juror in *Hessler,* York willingly went back into deliberations and did not express any further concern. Had she expressed further reservation about her verdict or about further deliberating, then it may have been necessary to conduct an inquiry. However, in this case, when the final verdict was read, Juror York unequivocally answered that she agreed with the verdict.

Certainly, a jury's attempt to reach a unanimous verdict is a difficult and emotional undertaking. This is inherent in the structure of the jury system itself, since "the very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves." *Allen v. United States* (1896), 164 U.S. 492, 501, 17 S. Ct. 154, 41 L. Ed. 528. As we stated in *Hessler*, 90 Ohio St.3d at 120, 734 N.E.2d 1237, "The requirement of a unanimous decision, however, does not come without a price. Heightened emotions and intense feelings are part and parcel of this process. Experience tells us that during deliberations, it is not unusual to find heavy-handed influencing, browbeating, and even bullying to a certain extent."

Under the circumstances presented, we do not find that the trial court abused its discretion in the handling of Juror York. Consequently, we overrule proposition of law II.

*State v. Brown*, 100 Ohio St.3d at 58-62; Apx. Vol. 4, pgs.524-527.

When a court is informed by a jury that they are having difficulty in arriving at a decision, a supplemental charge is appropriate. *Lowenfield*, 484 U.S. at 236. There is no exact time frame as to how long a jury should deliberate in the penalty phase before the trial court must instruct them that they are limited to the life sentence options or take the case away from the jury.  *Mason v. Mitchell*, 320 F.3d 604, 641 (6th Cir. 2003).   The habeas court must determine whether the "trial court's supplemental instruction was coercive in its context and under all the circumstances." *Id*. 320 F.3d at 640-41, (quoting *Jenkins v. United States,* 380 U.S. 445, 446 (1965)).  Whether or not a supplemental charge is coercive must be viewed in the

51

context of a particular trial. *Lowenfield,* 484 U.S. at 237.

The Ohio Supreme Court ruled in *State v. Howard* that the *Allen* charge, *Allen v. United States,* 164 U.S. 492 (1896), pressures dissenting jurors to change their minds and thus "[s]ubtly changes the requirement that the jury verdict be unanimous to one more closely resembling majority rule." *Id.* 42 Ohio St.3d at 22; *Mason*, 320 F.3d at 641 n. 21. The Court proposed the *Howard* charge which the trial judge in Brown's case gave with modifications.

The charge given by the trial judge was neutral in that it did not single out jurors in the minority. The judge included the crucial language, "It is your duty to decide the case if you can conscientiously do so." Tr. Vol. 29,  pg. 534. Further, the judge instructed the jurors earlier on their duties as follows:

> If you unanimously find by proof beyond a reasonable doubt that the aggravating circumstances Mark Brown was found guilty of committing outweigh the mitigating factors, you shall recommend to the court that the sentence of death be imposed upon Mark Brown. Absent such a finding, or if you are unable to unanimously agree, you shall recommend that Mark Brown be sentenced to life imprisonment with parole eligibility after serving 20 full years of imprisonment or to life imprisonment with parole eligibility after serving 30 full years of imprisonment.
> You are a jury of 12 people, impressive and intelligent and intellectual from all observations we have made of you, and we expect that your verdict will be rendered in accordance with your abilities and in accordance with your oath, so you should consult with one another and consider each others views before you return a verdict in this case.

Tr. Vol. 29, pgs. 487, 497. *See Bonnell v. Mitchell*, 301 F .Supp.2d 698, 749 (N.D. Ohio 2004). The jury deliberated 13 hours after the *Howard* charge was given before returning with their first verdict. One juror stated that her verdict was a compromise, but that was not caused by the *Howard* charge.  The jurors resumed deliberations and approximately two and one half hours later the same juror stated that the death penalty sentence was her verdict. Jurors are often

coerced to some extent by fellow jurors. This Court concludes that, under the totality of the circumstances of this case, there has been no constitutional violation.

Ninth Claim for Relief

Brown alleges in his ninth claim for relief that he was deprived of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments when the trial court admitted numerous gruesome, repetitive, and cumulative photographs during the mitigation phase of his case. This claim was presented to the Ohio Supreme Court asserting only violations of the Eighth and Fourteenth Amendments. Thus, this claim is partially defaulted. In any event, the Court, with or without consideration of the Fifth and Sixth Amendments, finds this claim to be without merit.

According to Brown, the trial court erred in admitting the photographs which were mostly of the decedents and the crime scene because: (1) the inflammatory and cumulative nature of the photographs outweighed any probative value; (2) the jury utilized the photographs in determining that the aggravating circumstances outweighed the mitigating factors; (3) the carry over effect from the use of the photographs denied Brown of his right to a decision based on reason rather than caprice or emotion; and (4) the repetitive nature of the photographs were not presented into evidence for the purpose of supporting the manner or mode of death.

Admission of evidence is a matter of state law and alleged error, such as improper admittance of evidence usually does not support a writ of habeas corpus. *Estelle*, 502 U. S. at 67. Admission of photographs alleged by Brown to be prejudicial is within the sound discretion of the court. An appeal as to admission almost always fails. If the evidence is probative, it will be hard to find a constitutional violation to exclude it; and if it is not probative, the defendant would most likely not be hurt by its admission. *Gonzalez v. DeTella*, 127 F.3d 619, 621 (7th Cir. 1997).

*See Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2005)(admission of gruesome photographs did not deprive petitioner of a fair trial).

The Court concludes that the decision of the Ohio court was not contrary to or an unreasonable application of clearly established constitutional law as determined by the United States Supreme Court.

Tenth Claim for Relief[5]

Brown contends that the trial court violated his Fifth, Eighth, and Fourteenth Amendment rights when it dismissed his motion for post-conviction relief by summary judgment without a hearing.  Brown presented this claim when appealing this decision to the Ohio court of Appeals.

The Ohio court of appeals in affirming the trial court's ruling dismissing his motion for post-conviction relief stated:

> As his second assignment of error, Brown asserts:
> "The trial court erred in granting summary judgment against Appellant Brown and dismissing his postconviction action in violation of Appellant's rights under Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution."
> Brown avers the trial court improperly dismissed his petition via summary judgment since he presented sufficient operative facts and supporting evidence de hors the record to merit an evidentiary hearing. However, a criminal defendant seeking to challenge his conviction through a petition for post-conviction relief is not automatically entitled to a hearing. *State v. Cole* (1982), 2 Ohio St.3d 112, 113, 2 Ohio B. 661, 443 N.E.2d 169. "Before granting an evidentiary hearing on the petition, the trial court shall determine whether there are substantive grounds for relief (R.C. 2953.21[C]), i.e., whether there are grounds to believe that 'there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States.' R.C. 2953.21(A)(1)." *State v. Calhoun* (1999), 86 Ohio St.3d 279, 282-83, 1999 Ohio 102, 714 N.E.2d 905. Therefore, before a hearing is granted, the petitioner bears the initial burden of submitting evidentiary documents containing sufficient operative facts that demonstrate the merit of his claims. *Id*.

---

[5]  Brown did not address his tenth and eleventh claims for relief in his Traverse.

With regard to the standard of review of a trial court's summary dismissal of a post-conviction petition, this court recently held in *State v. Reynolds*, 7th Dist. No. 99-CO-48, 2002 Ohio 135:

"The trial court's factual findings will not be reversed unless they are against the manifest weight of the evidence. Judgments will not be reversed, as being against the manifest weight of the evidence if they are supported by some competent, credible evidence. *Gerijo, Inc. v. Fairfield* (1994), 70 Ohio St.3d 223, 226, 1994 Ohio 432, 638 N.E.2d 533; *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 376 N.E.2d 578, syllabus. Upon accepting such findings of fact, an appellate court then independently determines the propriety of the trial court's conclusions of law." *Id.* at 3, 2002 Ohio 432. (footnote omitted)
A. Jury Claim

In his petition for post-conviction relief, Brown first alleged that his right to a fair and impartial jury was violated by an impermissibly coercive "dynamite" charge given by the trial court. He claims the charge led members of the jury to coerce another member into agreeing with the sentencing verdict. In support of this claim, Brown provided the trial court with an affidavit of juror Ella York claiming she was coerced and pressured by other jurors to return a verdict.

It is a longstanding rule that "the verdict of a jury may not be impeached by the evidence of a member of the jury unless foundation for the introduction of such evidence is first laid by competent evidence aliunde, i.e., by evidence from some other source." *State v. Reiner* (2000), 89 Ohio St.3d 342, 2000 Ohio 190, 731 N.E.2d 662, citing *State v. Adams* (1943), 141 Ohio St. 423, 427, 48 N.E.2d 861. Ohio has adopted this rule in Evid.R. 606(B), which states:

"Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith. A juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear on any juror, only after some outside evidence of that act or event has been presented. However a juror may testify without the presentation of any outside evidence concerning any threat, any bribe, any attempted threat or bribe, or any improprieties of any officer of the court. His affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying will not be received for these purposes." *Id.*

Here, Brown argues the evidence from some other source would be the transcript of the penalty phase in which York disavowed the jury verdicts. Brown claims that, "the clear repudiation of the verdicts by Ella York in open court is evidence aliunde that improper influence was brought to bear on her to change her verdict during **[\*\*13]** deliberations."

The Ohio Supreme Court was faced with a similar question involving alleged juror misconduct in *State v. Hessler* (2000), 90 Ohio St.3d 108, 2000 Ohio

30, 2000 Ohio 31, 734 N.E.2d 1237. In *Hessler*, the defendant claimed that a dialogue between the court and a reluctant and obviously distraught juror demonstrated that the juror wanted to vote for life sentences but was unfairly coerced and pressured to vote for death. Because the other jurors allegedly pressured this juror into changing her vote, the defendant argued he was denied the right to a fair and impartial jury because of juror misconduct. However, after reviewing the record, the Ohio Supreme Court could not say that juror misconduct occurred explaining:

"'The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves.' *Allen v. United States* (1896), 164 U.S. 492, 501, 17 S. Ct. 154, 157, 41 L. Ed. 528. The requirement of a unanimous decision, however, does not come without a price. Heightened emotions and intense feelings are part and parcel of this process. Experience tells us that during deliberations, it is not unusual to find heavy-handed influencing, browbeating, and even bullying to a certain extent. For always there is the possibility that 'articulate jurors may intimidate the inarticulate, the aggressive may unduly influence the docile.' *People v. De Lucia* (1967), 20 N.Y. 2d 275, 278, 282 N.Y.S.2d 526, 529, 229 N.E.2d 211, 213; *People v. Redd* (1990), 164 A.D.2d 34, 37, 561 N.Y.S.2d 439, 440 (both cases providing policy reasons for rule prohibiting jurors to impeach their own verdicts)." *Id*. at 120.

Here, Brown has presented much the same claim as the defendant in *Hessler*. Because Brown has failed to point to anything, besides the usual intense negotiations of any jury involved in a capital case, which did in fact cause a juror to change their vote, we conclude this portion of his second assignment of error must fail because it simply is not a basis of recovery.

B. Ineffective Trial Counsel Claim

Next, Brown claims he received ineffective assistance of trial counsel, based upon trial counsel obtaining a discoverable statement from Brown's mother, Betty Brown, concerning his alleged gang membership as a juvenile. Brown claims he was prejudiced by his attorney's actions since the prosecutor used this information as a major theme of the trial. Because this statement was used at trial and was an issue on direct appeal, the trial court dismissed this claim as being res judicata. The trial court further explained "since discovery is part of every case, it would seem absurd to penalize an attorney for preparing for trial. Besides, if petitioner's counsel decided not to use the statements once finding them to be prejudicial, the attorney could have faced contempt."

Brown maintains, however, that the argument could not have been made on direct appeal because he was represented by the same counsel both at trial and on direct appeal. Brown is correct. The Ohio Supreme Court has determined, that since "counsel cannot realistically be expected to argue his own incompetence, res judicata does not act to bar a defendant represented by the same counsel at trial and upon direct appeal from raising a claim of ineffective assistance of counsel in a petition for post-conviction relief." *State v. Lentz* (1994), 70 Ohio St.3d 527, 1994 Ohio 532, 639 N.E.2d 784 citing *State v. Carter* (1973), 36 Ohio Misc. 170,

65 Ohio Op. 2d 276, 304 N.E.2d 415. Thus, we continue our analysis of Brown's claim of ineffective assistance of counsel.

The United States Supreme Court, in *Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 104 S. Ct. 2052, set forth a two-part process to determine whether a conviction must be reversed upon a claim of ineffective assistance of counsel:

"First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."

A strong presumption exists that licensed attorneys are competent and that the challenged action is the product of a sound trial strategy. *Strickland*, 80 L. Ed. 2d at 694-95; *State v. Thompson* (1987), 33 Ohio St.3d 1, 10, 514 N.E.2d 407; *State v. Hamblin* (1988), 37 Ohio St.3d 153, 155-56, 524 N.E.2d 476. Debatable trial tactics employed by counsel do not constitute lack of effective counsel. *State v. Clayton*, 62 Ohio St.2d 45, 49, 402 N.E.2d 1189, certiorari denied (1980) 449 U.S. 879, 66 L. Ed. 2d 102, 101 S. Ct. 227. In addition, the court must evaluate "the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 80 L. Ed. 2d at 695.

Here, Brown claims that counsel was ineffective because he should have known that any statement made by Brown's mother would be discoverable pursuant to Local R. 9 which requires both prosecution and defense to exchange all witness statements prior to trial. Accordingly, counsel had a duty to take reasonable care not to elicit statements from his mother that would be damaging or prejudicial to Brown's case. Brown claims this could have been accomplished by "pre-interviewing" her before taking a recorded statement.

However, after a comprehensive review of Betty Brown's interview, it appears trial counsel was merely trying to obtain information regarding the difficulty of Brown's childhood as part of the mitigation strategy. More specifically, the interview with Betty Brown goes into great detail about Brown's troubled childhood and her problems with drug abuse. She discusses how she moved her children from place to place and how she beat them. She also discussed the violence that the children had witnessed and how she stole from them and did drugs in front of them. She also explained how she had been sent to prison and had to leave her children. Her comment regarding Brown being a member of a gang as a small child came up in the context of her not raising Brown properly. We conclude it was most likely trial counsel's mitigation strategy to paint Brown as a person who really never had a chance.

Accordingly, trial counsel was not ineffective for eliciting that response since all of this negative information was to be strategically used during the mitigation stage of the proceedings. *See Clayton*. Brown's second assignment of error is also meritless.

57

*State v. Brown*, Mahoning App. No. 01CA229, 2003WL 21518723 * 3-6 (Ohio App. 7th Dist. June 30, 2003); Apx. Vol. 6, pgs. 227-232.

Ohio law does not provide for an automatic evidentiary hearing on the claims raised in post-conviction petitions. *State v. Jackson,* 64 Ohio St.2d 107 (1980). The standard for granting an evidentiary hearing is whether the court determines there are substantive grounds for relief. R.C. § 2953.2 (c).   *Jamison,* 100 F Supp.2d at 567.  The court ruled that Brown did not present sufficient evidentiary documents to require an evidentiary hearing. Review of the court's decision shows that an evidentiary hearing was not necessary.  This Court concludes that the Ohio court's decision as to Brown's motion for post-conviction relief is not contrary to or an unreasonable application of clearly established constitutional law as determined by the United States Supreme Court.

Eleventh Claim for Relief

Brown contends in his eleventh and final claim for relief that the trial court should have given the jury an instruction on mercy. This issue has been raise in the Ohio courts and is preserved for federal habeas review.

There is no anti-mercy requirement in the Ohio statutes. *California v. Brown,* 479 U.S. 538, 541 (1987).  A jury may consider mercy but Ohio law does not mandate that a trial court give a mercy instruction. *Mapes,* 171 F.3d at 415-16; *Hartman,* 333 F. Supp.2d at 677.  This claim is without merit.

Evidentiary Hearing/Discovery

A.  Evidentiary Hearing

In his Traverse, Brown included a request for an evidentiary hearing and discovery.  He

58

argues that an evidentiary hearing is needed because he was denied the opportunity in state court to develop the facts.  28 U.S.C. § 2254(e)(2) sets forth the following standard the court must consider in deciding whether to allow an evidentiary hearing:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that-
> (A) the claim relies on--
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Paragraph 11 of the Court's case Management Order ( ECF 15) provides in pertinent part:

> Pursuant to 28 U.S.C. §2254(e), the request shall include a specification of the factual issues that require a hearing and a summary of the evidence the party proposes to offer. The request shall state with precision the issues of fact and questions of law making an evidentiary hearing appropriate under 28 U.S.C. §2254(e).

Brown has not satisfied the requirements of 28 U.S. C. § 2254(e)(2) nor has he set forth the issues of fact and questions of law requiring the Court to hold an evidentiary hearing.

Therefore, the request for an evidentiary hearing is denied.

### B. Discovery

A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course.  *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). Discovery in a habeas case is governed by Rule 6 of the Rules Governing Section 2254 Cases in the United States District Courts. The rule sets forth a two-pronged standard.

> A party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise.

Rule 6(a), Rules Governing Section 2254 Cases in the United States District Courts.

Good cause exists where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief. *Harris v. Nelson,* 394 U.S. 286, 300 (1969); *Lott*, 261 F.3d at 602.  The additional discovery need only show good cause that the evidence sought would lead to relevant evidence. *Payne v. Bell*, 89 F. Supp.2d 967, 970 (W.D. Tenn. 2000)(citing *Calderon v. U.S. Dist. Court For the Northern Dist. of California*. 98 F.3d 1102, 1106 (9th Cir. 1996)).  See *Keenan v. Bagley*, 262 F. Supp.2d 826, 838 (N.D. Ohio 2003), *vacated on other grounds*, 400 F.3d 417 (6th Cir. 2005).  Vague and conclusory allegations are not sufficient to allow discovery under Rule 6 and a petitioner may not embark on a fishing expedition in order to develop claims for which there is no factual basis. *Id.*

Brown has not explained why discovery would lead to evidence showing that he is entitled to relief.  His request for discovery is denied.

### Conclusion

### Certificate of Appealability

Pursuant to 28 U.S.C. § 2253 , the Court must now determine whether to issue Brown a Certificate of Appealability ("COA").  *See Castro v. United States*, 310 F.3d 900, 903 (6th Cir. 2003)(court may decide whether to issue a COA at the same time as the claims for relief are determined).  In the Sixth Circuit, a blanket grant as to all issues or a blanket denial is inappropriate. *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001). "Both of these approaches

60

undermine the gate keeping function of certificates of appealability, which ideally should

separate the constitutional claims that merit the close attention of counsel and this court from

those claims that have little or no viability." *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001).

28 U.S. C. § 2253 provides:

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an
appeal may not be taken to the court of appeals from--
  (A) the final order in a habeas corpus proceeding in which the detention
complained of arises out of process issued by a State court
  * * *
  (2) A certificate of appealability may issue under paragraph (1) only if the
applicant has made a substantial showing of the denial of a constitutional right.

In *Slack v. McDaniel*, 529 U.S.  473 (2000), the Supreme Court stated:

[t]o obtain a COA under § 2253 (c), a habeas prisoner must make a substantial
showing of the denial of a constitutional right, a demonstration that, under
*Barefoot,* includes showing that reasonable jurists could debate whether (or, for
that matter, agree that) the petition should have been resolved in a different
manner or that the issues presented were "adequate to deserve encouragement to
proceed further. "

*Id.* 529 U.S. at 483-84 (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)).

If a claim  has been procedurally defaulted, an additional factor must be determined.

When a claim has been denied on procedural grounds without a ruling on the underlying claim,

a COA will be issued only if "jurists of reason would find it debatable whether the petition states

a valid claim of the denial of a constitutional right and that jurists of reason would find it

debatable whether the district court was correct in its procedural ruling."  *Id.* 529 U.S. at 484.

Claims one, two, three, five and seven were procedurally defaulted.  The ineffective

assistance of counsel claims (one, two, and three) were not raised on direct appeal nor as part of

a *Murnahan* application. Claims five (inconsistent verdicts) and seven (insufficient evidence of

intent to kill) were not raised on direct appeal although they were clearly evident from the

61

record. Brown did not present any specific argument as to cause and prejudice for each procedural default. The Court finds that reasonable jurists would not debate the defaulted status of these claims.  Thus, a COA is denied as to these claims.

If the Court were to have considered the first, second, third, fifth and seventh claims, it would have found that jurists of reason would not debate this Court's decision on the merits. In the first sub-claim of the first claim (ineffective assistance of counsel, motion to suppress), the evidence showed that Brown voluntarily, knowingly and intelligently waived his *Miranda* rights. The second sub-claim (trace evidence expert) was without merit because there was no way to conclusively determine the origin of the lead residue and the evidence showed that Brown was the only one in the store when the shots were fired. In the third sub-claim (fingerprint/palm expert), the Court found that the evidence showed that the expert could not conclusively determine if the bullets were fired from the weapon recovered from Brown and that Boonie was not in the store when the gun was fired, so he could not have been the shooter as Brown claims. The second claim for relief, (ineffective assistance of counsel for failing to hire experts on substance abuse and inner city culture) was without merit because there was testimony as to the effect of drug and alcohol abuse on Brown and there was no indication of how testimony of inner city drug culture could have helped Brown. The third claim for relief (ineffective assistance of counsel for failing to make a complete determination after investigation of evaluations from experts, failure to interview family and friends and failure to present an expert on gangs) is also without merit because an expert testified about alcohol and drug abuse as it pertained to Brown, family and friends were interviewed and presenting an expert on gangs could have highlighted Brown's life of crime.

If the Court were to have considered the fifth claim for relief (inconsistent verdicts), it would have found that jurists of reason would not debate this Court's decision on the merits. Consistency in verdicts is not reviewable in habeas corpus. Further, The Ohio courts reweighed the appropriateness of Brown's sentence.

If the Court were to have considered the seventh claim for relief (insufficient evidence), it would have found that jurists of reason would not debate this Court's decision on the merits. The Court found that sufficient evidence to support a guilty verdict was presented to the jury.

The Court finds that jurists of reason would not debate this Court's decision as to Brown's fourth claim for relief ("other acts" evidence). The trial court's determination involved a matter of state law not cognizable in federal habeas corpus. Further, the other acts evidence linked Brown to the murders and identified him as the killer. The Court denies a COA as to this claim.

The sixth claim for relief raised the constitutionality of Ohio's death penalty scheme. Jurists of reason would not debate this Court's finding as all the sub-claims occur in capital habeas petitions and are routinely denied.  The Court denies a COA as to this claim.

The Court finds that jurists of reason would debate this Court's decision concerning Brown's eighth claim for relief (improper jury charge) because a  jurist of reason might find that the jury was irreconcilably deadlocked.  After thirteen hours of deliberation and the *Howard* charge was given, a juror announced that her verdict was a compromise. Two and one half hours later she stated that she agreed with the other jurors on the death sentence. Also, a jurist of reason might find that the judge should have inquired further whether her second verdict was a compromise.  The Court grants a COA as to this claim.

63

The Court finds that jurists of reason would not debate the Court's ruling on Brown's ninth claim for relief (admittance of gruesome photographs). Admission of the photographs was a matter of state law not cognizable on federal habeas corpus and was within the sound discretion of the trial judge.

The Courts decision as to Brown's tenth claim for relief (dismissal of post-conviction proceedings) is not debatable by jurists of reason. Brown failed to present sufficient evidentiary documents showing substantive grounds for relief to require an evidentiary hearing.  The Court denies a COA as to this claim.

Finally, the Court finds that jurists of reason would not debate the Court's decision as to Brown's eleventh claim for relief (failure to give mercy instruction).  There is no anti-mercy requirement in the Ohio statutes. Thus, the Court denies a COA as to this claim.

Accordingly, for the foregoing reasons, Brown's Petition for Writ of Habeas Corpus is denied. The Petition is hereby dismissed.

The Court hereby issues a certificate of appealability pursuant to 28 U.S.C. §2253(c) as to Brown's eighth claim for relief as noted in the above certificate of appealability analysis. The Court finds that none of the other claims are debatable among jurists of reason as no other ground for relief comes close to presenting a federal constitutional or legal violation.  As to the defaulted claims, the Court finds that jurors of reason would not find the Courts's decision to be debatable. Consequently, the court denies a COA as to all other claims for relief.

IT IS SO ORDERED.

Date: March 3, 2006                    __/s/ John R. Adams_____
                                       JUDGE JOHN R. ADAMS
                                       UNITED STATES DISTRICT JUDGE